981 A.2d 637

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## Joseph Cornelius RUDDY, Jr.

**Misc. Docket AG No. 7 Sept.Term, 2008.**

Court of Appeals of Maryland.

Oct. 6, 2009.

34

**36**

Raymond A. Hein, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Com'n of Maryland), for Petitioner.

Brian R. Zapp, Hyattsville, MD, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

The Attorney Grievance Commission of Maryland ("AGC"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") against Respondent Joseph C.

Ruddy, Jr. Bar Counsel charged Ruddy with violating the Maryland Rules of Professional Conduct ("MRPC") in his capacity as personal representative of the estate of his aunt, Mary Fitzsimmons. Specifically, Bar Counsel alleged that Ruddy violated the following rules: (1) Rule 1.3 (Diligence);[1] (2) Rule 1.7 (Conflict of Interest);[2] (3) Rule 3.3 (Candor Toward the Tribunal);[3] and (4) Rule 8.4 (Misconduct).[4] Following a hearing before a judge of the Circuit Court for Prince George's County, the hearing judge issued Findings of Fact and Conclusions of Law, in which he found by clear and convincing evidence that Ruddy violated Rule 1.7, but not Rules 1.3, 3.3, and 8.4.[5]

---

1. **Rule 1.3. Diligence.**
 A lawyer shall act with reasonable diligence and promptness in representing a client.

2. **Rule 1.7. Conflict of Interest: General Rule.** (Pre–July 1, 2005 version)
 . . .
 (b) A. Lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

3. **Rule 3.3. Candor Toward the Tribunal.**
 (a) A lawyer shall not knowingly:
 (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
 . . .
 (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

4. **Rule 8.4. Misconduct.**
 It is professional misconduct for a lawyer to:
 (a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
 . . .
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

5. In its Petition, Bar Counsel also alleged that Ruddy violated Rule 3.4 (Fairness to opposing Party and Counsel). The hearing judge, however,

In addition to acting as the personal representative of the Fitzsimmons estate, Ruddy was also involved in various capacities in the estates of his uncle ("the Hayes estate") and mother ("the Ruddy estate"), which were being probated at the same time as the Fitzsimmons estate. Two of Ruddy's three siblings, Maureen Dwyer and Michael Ruddy, were adverse to Ruddy throughout the two matters. With regard to the Ruddy estate, Ruddy challenged the appointment of his nephew, Maureen Dwyer's son, as personal representative and the nephew's decision to sell the Ruddy home to other members of Maureen Dwyer's family. Both challenges were ultimately successful.

AGC's investigation of Ruddy was triggered by the complaints of Maureen Dwyer's attorney, George Meng, and Michael Ruddy.[6] The hearing judge made the following findings of fact by clear and convincing evidence:

(1) That the respondent is sixty-four (64) years old and been engaged in the private practice of law for thirty-five (35) years.

(2) That the respondent has never been sanctioned for his conduct in the past, and in fact the only grievances filed against him have been by his sister, brother and Mr. Meng, all resulting from his handling of the Fitzsimmons estate, or the Fitzsimmons loan which preceded it.

(3) That the respondent prepared a Will for his aunt, Mary Fitzsimmons, on October 13, 1988; that the Will provided 48% of Mary Fitzsimmons' property to go to the respondent's mother, Catherine. Should Catherine predecease

---

made no finding as to this charge.

**6.** Ruddy testified that Meng threatened to file complaints with the Attorney Grievance Commission on multiple occasions in an attempt to gain leverage in the Ruddy estate litigation. Meng denied making any such threats. Ruddy's son, Joseph Ruddy III, an Assistant State's Attorney for Prince George's County, testified that he heard Meng make those threats on two occasions. The hearing judge declined to make any findings regarding Meng's motivation for filing the complaints, believing them to be irrelevant to the ultimate issue of Ruddy's professional misconduct as representative of the Fitzsimmons estate.

Mary Fitzsimmons, the result would be 12% of the Fitzsimmons estate would go to the respondent and each of his three siblings.

(4) That in April of 1993, the respondent borrowed $95,000.00 from Mary Fitzsimmons. The loan was undocumented and it was the intention of Mary Fitzsimmons that the loan be repaid to her estate upon her death without interest.

(5) On January 31, 2002, the respondent and his wife signed a promissory note to repay the $95,000.00 within one hundred twenty (120) days of Mary Fitzsimmons death with no interest to be paid within that 120 days but silent on interest thereafter.

(6) That the aforementioned promissory note was signed as a result of a conditional diversion agreement with the Attorney Grievance Commission, an additional term of which was that the note was to be held by someone other than the respondent.

(7) That the note was held by attorney Brian Zapp in his safe.

(8) That on January 31, 2003, respondent's mother died.

(9) That on April 3, 2003, Mary Fitzsimmons died.

(10) On August 6, 2003, the respondent opened the estate for Mary Fitzsimmons with himself as personal representative.

(11) That upon preparing the inventory of his aunt's estate in October of 2003, the respondent, in looking at the note, was reminded of the 120 day provision rendering the loan and note already in default status.

(12) That in October of 2003, the respondent, upon becoming aware of the default status, called Bar Counsel, Melvin Hirshman, and advised him that the note would be paid from his legacy and attorney's fees he would receive from the Fitzsimmons estate.

(13) That Bar Counsel, Melvin Hirshman, placed a memorandum of that call into his file contemporaneously.

(14) That the respondent filed the inventory on December 12, 2003 referencing the note and referring to it as being non-interest bearing. That on May 21, 2004, the respondent filed a first administration account which was approved by the Orphans' Court.

(15) That on July 5, 2005, respondent filed a second administration account which was approved by the Orphans' Court.

(16) That for some period prior to Mary Fitzsimmons' death, respondent's son James lived with Mary Fitzsimmons to provide overnight company for her.

(17) That the aforementioned son, James, was a student at Catholic University and after Mary Fitzsimmons died, on April 3, continued to live at the home rent free until the end of the school year.

(18) That after Mary Fitzsimmons' death, James returned to live in the house from January 1, 2004 through November 30, 2005, a period of twenty-three (23) months during which he was to pay rent of $350.00 per month.

(19) That on July 5, 2005, respondent filed a second accounting which was approved by the Orphan's Court.

(20) That four months after the second account was approved, Maureen Dwyer filed exceptions to the account and contended that she never received the second account.

(21) That both the respondent's certificate and the Orphans' Court records reflect a copy of the second account had been sent to Maureen Dwyer.

(22) That at a hearing before the Orphans' Court on Maureen Dwyer's objections to the second account on March 24, 2006, the respondent testified that his son James had made some additional rental payments to the $700.00 referenced in the first account and he had caught up when he obtained a job.

(23) That Orphans' Court Judge William Monks reached no conclusion nor made any finding regarding the rent, but rather directed the parties to try to resolve the issue

between them and if they were unsuccessful, they were to refer the matter back to him for further hearing.

(24) That immediately upon leaving the courtroom, the respondent advised attorney Meng (who in his capacity as Maureen Dwyer's attorney had asked the question regarding the rent) that in fact James did owe more rent despite having made some substantial payments.

(25) That from the moment of the respondents having advised attorney Meng of the apparent discrepancy in respondent's testimony before the Orphans' Court and the present time, a battle has been waged between the two attorneys as to whether the respondent should have advised the Orphans' Court of the inaccuracy of the respondent's testimony.

(26) That during the course of the administration of the estate, in lieu of a third account on May 30, 2006, the respondent filed an affidavit indicating that there had been no change in the estate.

(27) That in January of 2007, in lieu of a fourth accounting, the respondent filed an additional affidavit indicating there had been no change in the estate.

(28) That at the time of Mary Fitzsimmons death, her home at 2900 Lancer Drive, Hyattsville, Maryland was in essentially unlivable condition.

(29) That between the time of Mary Fitzsimmons death and the sale of the home, the respondent expended approximately three hundred and twenty (320) hours of time obtaining contractors, etc. in the repair, renovation and sale of the aforementioned home.

(30) That the home was sold by the respondent on March 16, 2007 for $301,000.00.

(31) That at the time of Mary Fitzsimmons death, the house was appraised at $88,000.00.

(32) That the respondent filed a fifth and final account on July 5, 2007; that the final account reflected the respondent's legacy to be less than the aforementioned $95,000.00 loan; that the respondent thereafter paid the $15,549.37 due

into the estate and thereafter took his approved fee of $34,252.00.

(33) That no interest was ever paid on the $95,000.00 loan.

(34) That during the course of the administration of the estate, despite the highly contentions nature of the case, no petition was ever filed requesting the respondent's removal as personal representative.

(35) That respondents request for attorney's fees was un-challenged.

(36) That during the course of the administration of the estate, show cause orders entered against the respondent were ultimately discharged as a result of respondent's ulti-mate compliance, even if untimely.

In finding clear and convincing evidence that Ruddy violat-ed MRPC 1.7 (Conflict of Interest), the hearing judge relied on the following additional findings:

(1) That the respondent's brother had filed a grievance against the respondent alleging that he had misused a power of attorney in obtaining the $95,000.00 loan; that this allegation was false.

(2) That as a result of the allegation, the respondent en-tered into a conditional diversion agreement in which the matter was resolved by the execution by the respondent and his wife of the aforementioned promissory note.

(3) That the only interest of Bar Counsel, Melvin Hirshman, in the matter prior to the instant case was that in seeing that the agreement had complied with, namely, that the promissory note had been appropriately executed and deliv-ered to a third person to be held for safe keeping.

(4) That respondent is a well-seasoned attorney and knew he was involved in an extremely contentious case and that all of his actions as regards the administration of the Fitzsimmons estate would be scrutinized by the brother and sister with whom he had a hostile relationship.

(5) That having made the phone call to Bar Counsel, Melvin Hirshman, in October of 2003 advising him that the loan would be paid from his legacy and attorney's fees, respon-

dent did believe that the arrangement had been given the blessing of the Attorney Grievance Commission.

(6) That respondent should have known that the aforementioned arrangement (and inherent conflict of interest) could not be resolved by advising Bar Counsel of the arrangement.

(7) That even had the respondent believed that the repayment resolved the conflict, he should have known that it could not possibly have resolved the issue of interest on the loan. That upon his opening the estate, the note was in default status and that another non-conflicted personal representative would have been duty bound to file suit against the respondent and obtain a judgment on the defaulted loan (thereby allowing it to accrue interest) or otherwise obtain interest by securing its immediate repayment.

In concluding that the evidence was not clear and convincing that Ruddy violated MRPC 1.3 (Diligence), the hearing judge relied on the following additional findings:

(1) That although administration of the estate took four years, such was not unreasonable in light of the fact that a number of factors contributed to the delays: The time necessary to repair, renovate and sell the home; the objections filed by the respondents' [sic] brother and sister; the Register of Wills backlog in reviewing documents that were filed.

(2) The respondent's appeals to the Circuit Court, while causing delays, were done by the respondent as a result of tactical decisions he was entitled to make.

(3) During 2004, when the respondent had a heart attack, he distributed more than half of the assets of the estate as a partial (voluntary) distribution thereof (although none to the estates to debtors; viz., himself and Maureen Dwyer).

(4) The testimony of the current Orphan's Court auditor that other than the time necessitated by the exceptions and the hearings thereon, the time required to probate the estate was fairly typical.

(5) That the time taken to probate the estate to conclusion itself did not in any way diminish the value of the assets of the estate or the ultimate distribution to the legatees.

In concluding that the evidence was not clear and convincing that Ruddy violated MRPC 3.3 (Candor Toward the Tribunal), the hearing judge relied on the following additional findings:

(1) In his testimony on March 24, 2006, a reading of the entire transcript makes it apparent that respondent's testimony was qualified by his statements that he had no firm knowledge of the times and amounts of payments his son had made but that those records were maintained by his bookkeeper who had had major surgery and was not available.

(2) Further as regards to that testimony, the Court finds that the respondent was not prepared to testify as he did not believe the Orphan's Court had the authority to open issues raised in an accounting long since approved.

(3) His testimony regarding the rent payments were [sic] not material in any event in light of the fact that no ruling was made and that the Orphan's Court instead directed the parties to work out the details between them.

(4) That whatever inaccuracy existed in his testimony was immediately corrected by the respondent in his advising attorney Meng (who was the attorney for the adverse party that had asked the questions) of all the salient facts immediately upon leaving the courtroom.

(5) That as to the accuracy of his affidavits in lieu of accountings, and his alleged false statement as to "no change", whether no change meant absolutely no change or no substantial change (as believed by the respondent) is a matter of Register of Wills policy. The current Register of Wills auditor testified that change meant absolutely no change. The prior auditor testified that no change meant substantial change. Neither could point to rule or statute justifying her respective position, as non [sic] such exists. In this estate, there was no substantial change.

In concluding that the evidence was not clear and convincing that Ruddy violated MRPC 8.4 (Misconduct), the hearing judge relied on the following additional findings:

(1) The respondent was in no way *intentionally* dishonest, fraudulent or deceitful.

(2) The conflict violation referred to above was unintentional on the part of the respondent.

(3) The respondent's client (the Fitzsimmons' estate) was not injured by the respondent's actions in that the interest lost on his loan was more than made up for by his numerous uncompensated hours spent repairing, renovating and selling the Lancer Drive property.

## DISCUSSION

### *Standard of Review*

We recently articulated the standard of review that we employ for attorney discipline proceedings:

This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland. Even though conducting an independent review of the record, we accept the hearing judge's findings of fact unless they are found to be clearly erroneous. This Court gives deference to the hearing judge's assessment of the credibility of witnesses. Factual findings by the hearing judge will not be interfered with if they are founded on clear and convincing evidence. All proposed conclusions of law made by the hearing judge, however, are subject to *de novo* review by this Court.

*Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 368, 952 A.2d 226, 235–36 (2008) (citations and quotation marks omitted).

When a party takes exceptions to findings of fact, we determine whether the findings have been proven by the appropriate standard of proof. *See* Md. Rule 16–759(b)(2)(B). Although the petitioner must prove the averments of the petition by clear and convincing evidence, the respondent need only prove matters of mitigation by a preponderance of evi-

dence. *See* Md. Rule 16–757(b). We may accept findings of fact not challenged by exceptions. *See* Md. Rule 16–759(b)(2)(B).

*Bar Counsel's Exceptions*

1. *Exceptions to Findings of Fact*

Bar Counsel noted six exceptions to the judge's findings of fact, which we will address in turn.

■ First, Bar Counsel excepts to the hearing judge's finding that Ruddy "expended approximately three hundred twenty (320) hours of time obtaining contractors, etc. in the repair, renovation, and sale of [Fitzsimmons's] home," noting that Ruddy only expended approximately two hundred thirty hours. In his petition for counsel fees, Ruddy indicated that he spent 230.1 hours for the "Coordination and Procurement of maintenance, repairs, renovations, and related activities as to the sale of the Decedent's Real Property[.]" Therefore, we find the hearing court's calculation to be clearly erroneous and sustain this exception, although it is immaterial to our analysis.

■ Second, Bar Counsel excepts to the judge's finding that "the time taken to probate the estate to conclusion itself did not in any way diminish the value of the assets of the estate or the ultimate distribution to the legatees[,]" arguing that such a finding is "purely speculative" because "the testimony of [Ruddy's] own witness, his sister Anne Gould, supports a finding that by failing to obtain professional listing of the house for over three years after his aunt's death, [Ruddy] missed out on the 'boom' real estate market that existed into 2005 and thereby caused a diminution of the value of a major estate asset." Bar Counsel's attempt to prove injury to the estate from the contingency of the real estate market is equally speculative. At the time of Fitzsimmons's death, her home was in an essentially unlivable condition. Bar Counsel provided no evidence to establish that the home could have been restored to marketable condition before the real estate market began to decline. There is no evidence that Ruddy idled in

obtaining contractors to complete the necessary repairs. By taking time to rehabilitate the home, rather than rushing to sell it in a dilapidated condition, Ruddy, it was determined by the hearing judge, fulfilled his personal representative obligation to faithfully protect the interests of the estate. The hearing judge's finding is not clearly erroneous, and we overrule Bar Counsel's exception accordingly.

■ Third, Bar Counsel excepts to the hearing judge's finding that Ruddy's appeals[7] to the Circuit Court "were done by the respondent as a result of tactical decisions he was entitled to make[,]" contending instead that they were "active efforts to orchestrate delays." During closing argument, Bar Counsel argued that Ruddy "effectively held the estate hostage" because of his "unhappiness with the filing of exceptions by his brother Michael and later by his sister Maureen, and disagreements he had with George Meng acting as counsel for Maureen Dwyer ... even though it was the right of his siblings to file exceptions and request additional information." After reviewing the record, we do not find any clear error in the hearing judge's finding. We recognize that Ruddy's administration of the Fitzsimmons estate did not occur in a vacuum, but in the context of prior, contentious interactions amongst the parties.[8] Ruddy was statutorily entitled to ap-

---

7. Ruddy filed two separate appeals with the Circuit Court, one on May 18, 2006 and another on August 24, 2007. Both were subsequently dismissed.

8. For example, we note the contrast between Bar Counsel's characterization that Ruddy "held the estate hostage" and the testimony of Ruddy's son, Joseph Ruddy III, in which he corroborated Ruddy's claim that Meng had used the prospect of a disciplinary hearing as a threat: "George Meng and my father and I were discussing preliminary matters and how we were going to conduct the hearing ... At that time, George Meng asked my father and me if we would allow him to forego calling certain witnesses and only have him put in reports ... My father and I's response were no [sic] ... You have to put it on pursuant to the rules of evidence, and we're going to go forward with the contested hearing. George got very upset ... And that's when he said remember I can go back and listen to that tape. And if you misstated anything, I'm going to have to file an ethical violation, and I

peal any final judgment or order by an Orphans' Court to the Circuit Court for *de novo* review. *See* Md.Code Ann. Cts. & Jud. Proc. § 12–502 (2009); *see also* Md. Rule 7–501 (2009).[9]

Bar Counsel cites *Attorney Grievance Comm'n v. Kendrick,* 403 Md. 489, 501, 943 A.2d 1173, 1180 (2008), as an analogous case where the respondent "chose to file motion upon motion" and "appeal upon appeal" rather than filing the requested administration account. Yet Bar Counsel ignores the crucial distinction between that case and this: in *Kendrick,* the decision from which the respondent appealed was to remove her as personal representative. The Orphans' Court had found the respondent and her co-personal representative to be "unable or incapable ... to discharge their duties and powers effectively." *Kendrick,* 403 Md. at 495, 943 A.2d at 1176. Rather than accepting the Orphans' Court's decision and stepping aside so that the replacement personal representative could probate the estate to conclusion, the respondent filed a Motion to Reconsider the Appointment of a Successor Personal Representative, took a subsequent appeal to the Circuit Court, appealed the Circuit Court's decision to the Court of Special Appeals, and then filed a Petition for a Writ of

---

will file an ethical violation. And during that conversation, he kept on saying if you want to play hardball, then I'll play hardball."

Another example of this contentious approach by Ruddy's siblings is revealed by the testimony of Ruddy's sister, Maureen Dwyer, regarding her pro se request for documentation from the already approved first accounting, to which she had not filed any exceptions: "I asked for these because I had noted that [Ruddy] asked for these for my mother's estate on a regular basis from my son ... It just seemed like if you can do it, I could do it ... I was just using your strategies. You asked for bank accounts, and I thought, well, if the lawyer asks for bank accounts, why can't—you know, why can't I ask for bank accounts?"

**9.** There was an unresolved dispute as to whether his appeals were premature, but we address only the question of Ruddy's decision to appeal, not the appeals' legal bases, as that is not the gravamen of the complaints against Ruddy. The Petition for Disciplinary or Remedial Action did not allege a violation of MRPC 3.1, which reads, in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes, for example, a good faith argument for an extension, modification or reversal of existing law."

Certiorari with this Court. During her tenure as personal representative, Kendrick consistently filed documents late, failed to attend hearings, received multiple delinquency notices, was held in civil contempt, and had her filings denied by both the Orphans' Court and the Register of Wills auditor.

Here, in contrast, no one made a request to remove Ruddy as personal representative, and Ruddy's appeals related to issues of estate administration, rather than appeals "for [his] own benefit" as Kendrick's appeals had been. *Kendrick*, 403 Md. at 501, 943 A.2d at 1180. The personal representative's duty is to administer the estate according to its best interests. *See* Md.Code Ann., Est. & Trusts § 7–101 (2009) ("A personal representative is a fiduciary."). Orders that affect estate administration are precisely the orders that the personal representative must scrutinize. The hearing judge was not clearly erroneous in finding that Ruddy's decisions to appeal were within the scope of his duties as personal representative. We therefore overrule Bar Counsel's exception.

██ Fourth, Bar Counsel excepts to the finding "as to the accuracy of [Ruddy's] affidavits in lieu of accounting, and his alleged false statement as to 'no change[.]' " Bar Counsel argues that it is a patent misrepresentation to testify to "no change" under oath when the attorney means "no substantial change" and has been advised by the Orphan's Court judge and current Register of Wills auditor that any change should have been reported. Kelly Del Rio, a Register of Wills employee since 1996 and the current Chief Deputy, testified that "no change" has always been a literal statement of no transactional change. Jennifer Sheffler, the Chief Deputy from 1997 to February 2007, testified that affidavits for no change meant "no substantial change," and that she would accept no change affidavits when there was merely no substantial change, since "[i]t's up to the interested persons to object."

The Chief Deputy before Jennifer Sheffler, Margie Beatty, testified that there is no set policy with regards to accepting no change affidavits when there was no substantial change,

explaining that "no change would be any real big change" and that what constitutes a big change "was basically up to the auditor." Brian Zapp, Ruddy's attorney, testified to having the same understanding as Ruddy:

> I understood what Prince George's County process was as Ms. Sheffler explained it that they'll accept an affidavit, even if it's technically incorrect, and it was not a big deal as long as you make sure your final account is correct and includes those matters.

Furthermore, both Jennifer Sheffler and Margie Beatty respectively characterized their decisions to accept no change affidavits when there was no substantial change as "a Register's procedure" and "strictly procedure." Accordingly, we cannot characterize the judge's finding as clearly erroneous. We overrule Bar Counsel's exception.

Fifth, Bar Counsel excepts to the finding that Ruddy's violation of MRPC 1.7 was unintentional, arguing that the violation could not have been unintentional if Ruddy knew he had a conflict of interest. Ruddy documented the loan, both in the inventory and in the record of the July 13, 2005, Orphans' Court hearing, and he "believe[d] that the arrangement had been given the blessing of the Attorney Grievance Commission," having advised Bar Counsel about the arrangement. Thus, the hearing judge's finding is not clearly erroneous. Indeed, it appears from the record that Ruddy believed that any conflict had been cured. Bar Counsel's exception is overruled. In overruling this exception, we do not suggest that Ruddy's lack of intent avoids the violation; rather, it is only a mitigating factor.

Finally, Bar Counsel excepts to the finding that the Fitzsimmons estate was not injured "in that the interest lost on [Ruddy's] loan was more than made up for by his numerous uncompensated hours spent repairing, renovating and selling the Lancer Drive property," characterizing it as speculative and unsupported by the evidence. Our own review of the record, however, reveals the supporting evidence. After re-

paying the $95,000 loan,[10] Ruddy requested only the statutory fees allowable for a personal representative ($34,252) and was awarded exactly that amount. This attorney fee award was easily supported by his 300.6 hours of legal work detailed in his Petition for Allowance of Counsel Fees and Costs ("Petition For Fees").[11] In addition to this legal work, Ruddy expended 230.1 hours hiring contractors to repair and renovate the Fitzsimmons home. Although he set forth these hours in his Petition For Fees, he did not actually receive compensation for this work. We conclude, therefore, that it was not clearly erroneous for the hearing judge to find that the 230.1 hours were not compensated by Ruddy's attorney's fee award and that his unremunerated time could offset the interest due on the loan. Bar Counsel's exception is overruled.

### 2. *Exceptions to Conclusions of Law*

### A. *MRPC 1.3 (Diligence)*

Bar Counsel took exception to the hearing judge's conclusion that Ruddy did not violate MRPC 1.3 (Diligence). Bar Counsel argues that as personal representative and attorney for the Fitzsimmons estate, Ruddy was a fiduciary and had the obligation to settle the estate expeditiously and with minimal value diminution. Conceding that mere failure to comply with deadlines is not necessarily sufficient to constitute a violation of MRPC 1.3, Bar Counsel argues that Ruddy's repeated failure to file required documents in a timely manner was a "blatant disregard of deadlines set forth in reminder notices and show cause orders issued by the Register of Wills

---

10. When Ruddy made September 2004 distributions to the other residual legatees, in the total amount of $209,000, he withheld from distribution his residual share. In the Fifth and Final Accounting, when he distributed the balance of the estate, Ruddy credited his $79,450.63 legacy (12% of the estate) against the amount owing under the $95,000 loan. He subsequently paid the remaining balance of the loan when he deposited $15,502.15 into the Fitzsimmons account on August 8, 2008.

11. At a conservative hourly rate of $150 per hour, his 300.6 hours of legal work could be reasonably valued at $45,000.

and Orphans' Court." Bar Counsel also argues that, although "most of the problems with the [Fitzsimmons] house existed already at the time of [Ruddy's] aunt's death[,]" Ruddy did not substantially repair and renovate the house until over two years later. Similarly, Ruddy told the Orphans' Court judge that the house was ready for sale in July 2005, but he neither sold the house nor listed it with a realtor until September 2006. According to Bar Counsel, the hearing judge thus erred by failing to consider the fact that Ruddy's "delay in making necessary repairs and in having the property listed for sale by a professional real estate agent" caused the listing of the house to miss the "real estate 'boom' period."

MRPC 1.3 requires lawyers to act with *"reasonable* diligence and promptness." (emphasis added). The question of a MRPC 1.3 violation, therefore, cannot be resolved by a categorical determination of what constitutes diligence and promptness, but must be examined in context of the surrounding circumstances.

While we cannot condone Ruddy's delays, we do not agree that they rise to the level of misconduct. Bar Counsel's first complaint regarding Ruddy's diligence and promptness is his failure to submit filings in a timely manner. The estate inventory[12] was due November 4, 2003, and Ruddy did not request an extension of time until November 12, 2003; the Register of Wills granted the extension until December 4, 2003, and Ruddy did not file the inventory until December 12, 2003. The first estate account was due May 2, 2004, but Ruddy did not submit it until May 21, 2004. The second estate account was due February 14, 2005, and the Orphans' Court issued a Show Cause Order on February 22, 2005, requiring Ruddy to show cause by April 22, 2005, as to why he did not submit the second account. On April 14, 2005, Ruddy filed a letter claiming not to have received the Register of Wills' reminder notice about the second account and thus

12. Section 7–201 of the Estates and Trusts Article requires an inventory of the decedent's property within three months after the personal representative's appointment.

being unaware that the account was due and asking for a thirty day extension and for the Show Cause order to be vacated. On June 3, 2005, the Orphans' Court dismissed the order, directing Ruddy to submit the account "within 25 days," but Ruddy did not submit the account until July 5, 2005. The third account was due January 18, 2006, and on January 26, 2006, Ruddy requested an extension of time; the extension was granted until February 21, 2006. On February 28, 2006, Ruddy requested another extension of time, which was granted until May 22, 2006.[13] Ruddy did not submit the "Affidavit in Lieu of Third Administration Account" until May 30, 2006. The fourth account was due December 15, 2006, and the Orphans' Court issued a Show Cause Order on December 28, 2006, requiring a showing of cause by March 15, 2007. Ruddy filed an "Affidavit in Lieu of Fourth Administration Account" on January 9, 2007. Although Ruddy indicated his intention to file the final account within thirty days of settlement of the sale of the Fitzsimmons property on March 16, 2007, he did not file the account until July 5, 2007. On October 9, 2007, the Register of Wills sent Ruddy a Notice to Amend the final account by November 9, 2007, and Ruddy filed for an extension of time on November 21, 2007, which was granted until January 14, 2008. Ruddy did not file the account until February 1, 2008, although he did submit a preliminary draft on January 25, 2008. The final account went through two more revisions until it was finally approved "approximately one year after [Ruddy] first filed a Fifth and Final Administration Account and more than 5 years after the death of Mary Fitzsimmons."

Although Ruddy's submission of the amended fifth account was two weeks late, Wanda Walker testified that "when we look at a draft we normally give the attorney thirty days[,]" and his submission of the preliminary draft of the account five days earlier was only nine days late. Although Bar Counsel

---

**13.** More specifically, upon receiving Ruddy's motion for an extension, the Orphans' Court judge decided to deal with the issue at the March 24, 2006, hearing, at which an extension was granted until May 22, 2006.

complains about the length of time it took to approve the Fifth and Final Administration Account—namely, one year—Bar Counsel concedes that the Register of Wills was responsible for three months of delay, and both Ruddy's counsel and Wanda Walker testified that the Register of Wills lodged entirely new requests for supplemental information *after* the February 1, 2008 submission of the amended fifth account.

Bar Counsel cites *Kendrick,* supra, and *Attorney Grievance Comm'n v. Christopher,* 383 Md. 624, 861 A.2d 692 (2004) for the proposition that the untimely filing of required administration accounts supports the finding of a MRPC 1.3 violation. Both cases are distinguishable from this one and therefore only reinforce the importance of eschewing categorical determinations of what reasonable diligence and promptness entail. *Kendrick* involved a pattern of behavior so egregious that it called into question the respondent's competence.[14] Unlike in *Kendrick,* the Orphans' Court here did not hold Ruddy in contempt or reject his filings. Indeed, both former Chief Deputies, Jennifer Sheffler and Margie Beatty, testified that Show Cause Orders are "a common occurrence" in estate administration. And testimony from Register of Wills representatives reveals that a measure of delay is routinely tolerated by that office. Moreover, the Orphans' Court never indicated any displeasure with Ruddy's performance as personal representative.[15] Further emphasizing the difference between *Kendrick* and the present case, the hearing judge found that "despite the highly contentious nature of the case, no petition was ever filed requesting the respondent's removal as personal representative," and "respondent's request for attorney's

---

14. The respondent in *Kendrick* was found to have violated MRPC 1.1 (Competence), which reads: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

15. At a March 24, 2006, hearing, the Orphan's Court judge expressed his displeasure that the Fitzsimmons property remained unsold, while acknowledging Ruddy's diligence in attempting to sell it. We discuss this below.

fees was unchallenged." We will not override the assessments of both the Orphans' Court and the Circuit Court as to the seriousness of the Respondent's tardy filings.

In *Christopher*, also cited by Bar Counsel, the respondent, who was originally retained to represent the decedent's estate, petitioned for appointment as the replacement personal representative following the death of the designated representative. After receiving an overdue notice and then a Show Cause Order regarding the Second Administration Accounting, the respondent waited an additional 37 days before filing the account. Although the respondent "was on notice at the time of [the original representative's] death . . . that estate monies were missing[,]" *id.* at 631, 861 A.2d at 696, he "made no report, nor investigated further prior to filing the Second Accounting[,]" *id.* at 632, 861 A.2d at 697. Similarly, the respondent "knew the accounting to be false when he signed [the Third Administration Account]" on November 14, 2002,[16] but he nonetheless "filed the false report to gain more time to determine how to proceed because he did not know how to account for the missing money." *Id.* at 633, 861 A.2d at 697. The hearing judge concluded that the respondent violated MRPC 1.3 because he "failed to file the Second and Third Administration Accounts in a timely manner and undertake a timely investigation into the estate account history prior to filing the Second and Third Administration Accounts." *Id.* at 636,861 A.2d at 699. Because neither the respondent nor Bar Counsel filed any exceptions, we simply noted our agreement with the hearing judge's conclusions.

The *Christopher* respondent's failures to undertake timely investigations into the estate account history constituted neglect of a matter entrusted to him. In the present case, however, not only did the hearing judge find that the time required to probate the estate caused no adverse effect, but unlike the respondent in *Christopher*, Ruddy did not "clearly neglect[ ] a matter . . . entrusted to him." Indeed, the hear-

---

**16.** The hearing judge stated that this was an untimely filing, but there is no indication in the opinion as to when it was due.

ing judge found that "Ruddy distributed more than half of the assets of the estate as a partial (voluntary) distribution thereof" relatively early in the estate administration.

Ruddy did transgress the seven day grace period permitted by the Register of Wills before issuing Show Cause Orders five times.[17] One of those times was Ruddy's two month delay between when the Second Account was due and when he wrote a letter to the Orphans' Court, claiming to have never received the reminder notice. Although two months may be lengthy, the hearing judge found that, "show cause orders entered against the respondent were ultimately discharged[.]" The Orphans' Court discharged this particular Show Cause Order, and we defer to its decision on this point. Of the remaining four missed deadlines, the longest period of time by which Ruddy missed the deadline was seventeen days, which contrasts favorably with the five month delay in *Christopher* and the four year delay in *Kendrick*.[18]

As Bar Counsel concedes, not every instance of tardiness constitutes a MRPC 1.3 violation. Even repeated failures to make required filings in a timely fashion in the Orphans' Court may be tolerated if that court has declined to sanction the tardiness. We do not agree that his administration of this estate constitutes the "blatant disregard of deadlines" as Bar Counsel alleges.

---

**17.** There was a sixth instance that we discovered upon our review of the record, but Bar Counsel does not cite it, and it does not affect our analysis.

**18.** There is also evidence that at least one of these four submissions— the Affidavit in Lieu of Fourth Administration Account—owed its lateness to a miscommunication about the Register of Wills' policy regarding the effect of an appeal to the Circuit Court. Former Chief Deputy Margie Beatty testified that, in her experience, the Register of Wills would not require an interim account for a case that was on appeal because any exceptions filed on appeal would affect the balance carried forward. Former Chief Deputy Jennifer Sheffler testified that the Register of Wills would almost automatically extend the deadline for the second account if the first account had not been approved and had an exceptions hearing scheduled.

We are similarly unpersuaded by Bar Counsel's argument regarding the length of time it took Ruddy to sell the Fitzsimmons property. The record amply supports the hearing judge's finding that the length of time it took to sell the house did not raise a diligence issue and that the time necessary to repair and renovate was reasonable. The testimony of Ruddy's sister, Ann Gould, who helped sell the property in her capacity as a real estate agent, supports Ruddy's argument that he had, indeed, been renovating and trying to sell the house throughout the estate administration. Ann Gould testified that some of Ruddy's early repairs either failed to remedy the underlying cause of the problem or were damaged by later events, warranting further repairs and lengthening the process. Moreover, she testified that after Ruddy enlisted her help, he was cooperative and followed her advice in a "reasonably expeditious manner."

Indeed, Maureen Dwyer's testimony does not contradict this, as her knowledge derived entirely from intermittent observation:

[Ruddy]: You say you first noticed the for sale signs in July of '06. Is that right?

[Maureen Dwyer]: Right.

[Ruddy]: But you have no personal knowledge whether I did anything else before that to sell the house, do you?

[Maureen Dwyer]: I watched the ads frequently. Never saw an ad ... I generally watched them almost every week. That would be my personal experience, in the Washington Post. And I never saw one.

\* \* \*

[Ruddy]: So you wouldn't know whether I'd given leaflets in the fall of 2005, whether or not I had held open houses in the neighborhood, for people in the neighborhood. You wouldn't know any of that, would you?

[Maureen Dwyer]: I went by frequently. If I rode by, it was usually on the weekend, and I never saw any activity except evidence that James was there occasionally.

On March 24, 2006, the Orphans' Court judge told Ruddy, "You've worked diligently to attempt to sell it but it's not sold." At that point, at least, the Orphans' Court was satisfied with Ruddy's diligence. It did indicate, however, its displeasure that the house had not been sold within three years of Mary Fitzsimmons' death, which is why it ordered Ruddy to list the property with a realtor if it had not been sold by April 24, 2006. Ruddy did not list with a real estate agent until September 2006, when he handed over control to Ann Gould. Ruddy testified that his decision was based on his desire to save the estate from paying realtor commissions and that he planned to rely on his prior experience of selling houses.[19] Given the totality of the circumstances, it was within the hearing judge's discretion to find no lack of diligence.

Bar Counsel's MRPC 1.3 exception is overruled.

### B. *MRPC 3.3 (Candor Toward the Tribunal)*

 Bar Counsel took exception to the hearing judge's conclusion that Ruddy did not violate MRPC 3.3 (Candor Toward the Tribunal), pointing to two instances of alleged misconduct.

#### *"No Change"*

Bar Counsel again brings up Ruddy's "no change" entries in his accountings. He avers that Ruddy violated MRPC 3.3 by submitting affidavits in lieu of the third and fourth estate accounts, certifying that there had been "no change" in the Fitzsimmons estate since the second account filed in July 2005.[20] It argues that "[i]t is absurd to suggest that an

---

**19.** Ruddy explained, "[I]f the house is worth $300,000, I'm trying to save $18,000 for the real estate commissions. And I had done it on many occasions, and I had never had a good experience with a real estate agent. Never."

**20.** The contested language reads as follows: "I do solemnly affirm under the penalties of perjury that the matters and facts stated herein are true and correct to the best of my knowledge, information and

attorney may falsely certify under oath that there was *no change* during an estate account period by relying on a vague discretionary standard encompassing *no substantial change."* According to Bar Counsel, Ruddy's subsequent failure to correct these statements constitutes a violation of MRPC 3.3, especially after being advised by both an Orphans' Court judge and the Register of Wills Chief Deputy that "no change" is a literal phrase.

MRPC 3.3 provides, in relevant part:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

. . .

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

This Rule reflects a fundamental principle upon which the legal profession rests, as we have repeatedly emphasized throughout our caselaw. *See, e.g., Attorney Grievance Comm'n v. Guberman,* 392 Md. 131, 137, 896 A.2d 337, 340 (2006) ("candor and truthfulness are two of the most important moral traits of a lawyer") (quotations and citation omitted).

Nevertheless, in light of the testimony about the common use of "no change" affidavits, we defer to the hearing judge's finding that Ruddy's proffer of incorrect information was not intentional or deceitful.[21] As the judge explained, Ruddy did not unilaterally or unreasonably distort the meaning of the phrase; rather, his understanding of the "no change" affidavit was informed by over two decades of Register of Wills prac-

---

belief: 1. That there has been no change in the Estate since the filing of the Second Administration Account."

**21.** Specifically, the hearing court found that "[Ruddy] was in no way intentionally dishonest, fraudulent or deceitful."

tice. The hearing judge found that a determination of whether "no change" was a literal assertion was "a matter of Register of Wills policy" and that Ruddy's statement was entirely accurate according to one of the proposed interpretations of the phrase. Although Ruddy would have done better to aim for more precision so as to avoid misleading the court and to ensure an accurate and timely accounting of estate assets to the interested parties, we are not prepared to predicate a violation of MRPC 3.3 on Ruddy's use of "no change" affidavits. Ruddy's use of the affidavits does not establish that Ruddy knowingly misrepresented facts to the court. Thus, Bar Counsel's exception to the hearing court's finding that Ruddy did not violate MRPC 3.3 is overruled.[22]

### *Testimony Regarding Ruddy's Son's Rent Payments*

■ Bar Counsel's MRPC 3.3 exception points to Ruddy's testimony at the Orphans' Court hearing on March 24, 2006 regarding his son James' rent payments. In response to opposing counsel Meng's questions about the current status of James' rent and whether he owed additional money, Ruddy responded, "[H]e caught up once he got employed."[23] Bar

---

22. In the Fifth and Final Account, Ruddy did disclose all changes subsequent to the Second Account and he explicitly indicated that the final accounting covered the entire period since the Second Account.

23. The actual exchange during the March 24, 2006 hearing is as follows:

[Meng:] On the first account you showed income of $700 dollars rent?
[Ruddy:] Correct.
. . .
[Meng:] Am I correct that that was two months at $350 dollars received from your son?
[Ruddy:] I believe it was.
[Meng:] Why if your son moved in in May of '04—strike that. What two months did the $700 dollars cover?
[Ruddy:] They covered some time between January and May of '04.
. . .
[Meng:] Has your son paid subsequent rent?
[Ruddy:] Yes he has.
[Meng:] When did he make those—
[Ruddy:] He made a lump sum payment about six months ago.
[Meng:] And how much was the lump sum payment?

Counsel contends that the testimony "was material to the issues under consideration at that hearing. . . . The fact that [the judge] held the matter in abeyance to permit attempts at informal resolution did not make the testimony any less material." Bar Counsel insists that Ruddy's failure to inform the Orphans' Court of the error constitutes MRPC 3.3 misconduct.

It is clear from the hearing judge's findings that Ruddy's testimony cannot support a MRPC 3.3 violation. First, Ruddy was unprepared for the line of questioning regarding the Fitzsimmons estate's utility bills and James' rental payments, and he warned Meng and the court of that fact:

[Meng:] Is there a reason why having received Mrs. Dwyer's letter questioning those, specifically questioning those utilities and asking that you itemize those, that you didn't bring that information with you?

[Ruddy:] Well that information is calculated by my bookkeeper and she's ill. She's just had major surgery.

\* \* \*

[Meng:] And are you telling me that without your bookkeeper you can't retrieve these kinds of documents?

[Ruddy:] I'm saying that I did not retrieve them because of two factors. One is I felt the exceptions were filed three and a half months after the deadline (a) and (b) I normally don't do this. I mean my bookkeeper has a system and I rely on her.

Indeed, Ruddy objected to the line of questioning regarding the issue of rent, arguing that it had already been ruled on and was therefore not appropriate for the hearing.

We do not question that Ruddy's testimony was inaccurate. His own records indicate that as of the hearing, his son had only paid approximately $2,760—approximately eight months

---

[Ruddy:] I don't remember.
[Meng:] So as things went along he wasn't making payments and then he paid all the back payments about six months ago?
[Ruddy:] Yes, he caught up once he got employed.

of rent out of the twenty-three months owed. MRPC 3.3, however, only requires correction when the misrepresentation is material, and we defer to the hearing judge's finding that it was not. Bar Counsel excepts to that finding and argues that "it is not up to the lawyer who offered the false evidence to determine its materiality." *See Holden v. Blevins,* 154 Md. App. 1, 6, 837 A.2d 1053, 1056 (2003) (holding that it is for the trial judge to decide whether the false evidence is material, rather than the lawyer). Yet here, it *was* the hearing judge, and not Ruddy, who determined that the testimony was "not material in any event in light of the fact that no ruling was made and that the Orphan's Court instead directed the parties to work out the details between them."

This is supported by the record, which reveals two noteworthy points. First, the Orphans' Court continued the hearing so that the parties could resolve the exceptions informally, outside of its adjudicative authority.[24] *See* MRPC 3.3 cmt. 1 ("This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal ... [or] in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition."). Second, the disputed testimony occurred when Meng asked if Ruddy's son "paid all the back payments about six months ago," and Ruddy responded with the statement, "Yes, he caught up once he got employed." But "six months ago" would have been September 2005, and Ruddy's son lived in the house until November,

---

**24.** The Orphans' Court adopted Meng's proposed solution:

Mr. Meng: I have a possible solution for all of this.... Rather than producing all this stuff I'm willing to simply review it there and I can report back to my clients what I've seen.... And I could then say yea or nay about a follow on hearing to this if it's all documented no problem on hearing....

The Court: Okay. If you can, like all discovery, *if you can work out some type of informal agreement that certainly would serve the interests of the Court. I would prefer not to order anyone to do anything but certainly whatever needs to be done. So why don't we leave that as that you two will work informally to resolve discovery issues that exist and should that break down then you can file whatever you wish to file.*

Mr. Meng: I'll file something and if it doesn't break down I'll file something withdrawing the exception. (Emphasis added.)

two months later. Even if Ruddy's son had paid the entire balance in September, he might still owe two months of rent. Both Meng and the Orphans' Court were on notice that Ruddy's son may yet be in arrears. Thus, Ruddy's statement that his son had, at one point, paid the full balance of rent was immaterial because it had no bearing on whether the son presently owed money. Moreover, Ruddy answered both questions by providing the accurate documentation a little over one month later. Bar Counsel does not explain how even a month's lag affected proceedings in front of a tribunal when the Orphans' Court never dealt with the issue.

Furthermore, Ruddy informed Meng about the inaccuracy immediately after the hearing. Meng testified to that fact:

Q: Do you recall any of your discussions that day after the hearing?

* * *

A: Well, we were outside the courtroom and it had been my understanding from the testimony that there was no rent owed at that point. Outside the courtroom Mr. Ruddy indicated that there was still rent owed.

From that point forward, Meng had plenty of opportunity to bring the matter to the court's attention, yet he did not, insisting that Ruddy do so. Regarding correcting a misrepresentation, two Comments to MRPC 3.3 are instructive. One advises disclosure to the court, and the other advises disclosure of the client's deception to the court or other party. *See* MRPC 3.3 cmts. 7 and 12. Given the adversarial nature of our legal system and the Orphans' Court's continuance of the hearing so that the parties could resolve the dispute informally, Ruddy met his burden by disclosing the information to Meng.

Bar Counsel's MRPC 3.3 exception is overruled.

### *Ruddy's Exceptions*

*1. Undue Influence/Conflict of Interest*

Ruddy excepts to the hearing judge's denial of his motion to dismiss the disciplinary action on the grounds that Meng's

status as a member of the Attorney Grievance Commission created a conflict of interest for Bar Counsel and unduly influenced his objectivity. Ruddy argues that "because of Mr. Meng's extremely high profile resulting from his service to and on the Attorney Grievance Commission ... Assistant Bar Counsel began to defer to Mr. Meng in the evaluation of the validity of Mr. Meng's two (2) Complaints." In short, Ruddy argues that there is an incurable Conflict of Interest when, in a highly contentious case, a member of the Attorney Grievance Commission reports opposing counsel to Bar Counsel for ethical violations. According to Ruddy,

> [i]nstead of a neutral third party, this matter was investigated by Bar Counsel, who was an at-will employee of the Attorney Grievance Commission. The Attorney Grievance Commission recommends Bar Counsel's budget, salaries, promotions, and other personnel and funding decisions. There is a substantial interplay between Bar Counsel and the individual commissioners.

We disagree with these generalizations. The effect of presuming a conflict of interest whenever a lawyer member of the Attorney Grievance Commission reports misconduct would be to preclude such Commission members from so reporting. We would be unwise to adopt such a rule. "A lawyer who knows that another lawyer has committed a violation of the Maryland Lawyers' Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, *shall* inform the appropriate professional authority." MRPC 8.3 (emphasis added). MPRC 8.3 applies to all lawyers, whether or not they are members of the Attorney Grievance Commission. Holding that any such report automatically engenders undue influence and a resulting conflict of interest would effectively shield the misconduct in question from scrutiny, since a decision to not report the misconduct raises the specter of a MPRC 8.3 violation, while a decision to report the conduct guarantees that the disciplinary proceedings are fatally defective.

To be sure, Bar Counsel are not immune to the effect of competing interests, and they are subject to conflicts of interest like any lawyer. *See* Md. Rule 16–742(d) ("A member of a Peer Review Panel shall not participate in any proceeding in which the member's impartiality might reasonably be questioned."); *Bowen v. State Bar,* 177 P.3d 611, 614 (Utah 2008) ("While there is no formal mechanism for recusal of screening panel members, participating members should be conscientious in identifying and disclosing conflicts of interest, and should recuse themselves when such conflicts exist."). Whether a conflict of interest existed is simply a question of fact.

The Supreme Court of Minnesota confronted a similar situation in *Kennedy v. L.D.,* 430 N.W.2d 833 (Minn.1988). In *Kennedy,* the petitioner had filed three separate complaints against lawyers employed by the Office of Lawyers Professional Responsibility ("Director's Office"), which were heard by panels from the Lawyers Professional Responsibility Board ("Board") and dismissed. He alleged that "the Board and the Director's Office are not separate entities and therefore, allowing Board members to initially review complaints against attorneys in the Director's Office creates an impermissible conflict of interest." *Kennedy,* 430 N.W.2d at 835. After determining that there was no structurally inherent conflict of interest, the court stated, "[The petitioner] has presented no basis for disqualification. He simply alleges that there may be a conflict. Absent a showing of actual bias on the part of a panel member, we must presume that the panel members acted honestly and with integrity in their roles as decision-makers." *Id.* at 837.

▮▮▮▮ Unlike the petitioner in *Kennedy,* Ruddy points to specific instances that he alleges illustrate Assistant Bar Counsel's deference to Meng's opinion. We shall review these instances in turn. Ruddy alleges that "[o]nce Mr. Meng's Complaint was consolidated with Respondent's brother's Complaint both Assistant Bar Counsel and the Peer Review Panel gave an implied credibility to Respondent's brother's Complaint that would not have been granted if Respondent's

brother's Complaint was required to stand alone." Ruddy argues that his brother's previous multiple unsuccessful Complaints against Ruddy in the past would have undermined the validity of his brother's current Complaint. Bar Counsel may well view a serial complainant with some skepticism, but this would not be determinative. "Bar Counsel has a duty to investigate all complaints filed with the Commission that are not facially frivolous or unfounded[.]" *Attorney Grievance Comm'n v. Lee,* 393 Md. 546, 561, 903 A.2d 895, 904 (2006). Moreover, the mere submission of a second complaint by a different party would buttress the less credible complaint as a second, independent source.

We keep in mind that a complaint is simply the mechanism by which Bar Counsel becomes aware of possibly questionable attorney conduct. After learning of such conduct, whether by complaint or otherwise, Bar Counsel makes an "appropriate investigation," Md. Rule 16–731, and it is that investigation that dictates the procedure that Bar Counsel follows. *See* Md. Rule 16–734. That "Bar Counsel is not obliged to dismiss a complaint solely at the complainant's request," *Lee,* 393 Md. at 561, 903 A.2d at 904, highlights the limited role of the complaint.[25]

Ruddy perceives inappropriate deference by Assistant Bar Counsel to Meng because of Bar Counsel's lack of concern about the fact that Meng "took almost six (6) months to initiate his First Complaint as regards conduct that supposedly raised substantial question as to Respondent's honesty, trustworthiness and fitness to be a lawyer." Similarly, he points out, when Meng admitted that Ruddy corrected his March 24, 2006, testimony outside the courtroom, Assistant

---

25. Ruddy's criticism of Assistant Bar Counsel's decision to "adopt[] [Meng's] ... correspondence as the basis of a separate Complaint" is unfounded, given that "[a]ny written communication that includes the name and address of the person making the communication and states facts which, if true, would constitute professional misconduct by or demonstrate incapacity of an attorney constitutes a complaint," and that "Bar Counsel also may initiate a complaint based on information from other sources." Md. Rule 16–731.

Bar Counsel "chose to emphasize his appreciation for Mr. Meng's clarification rather than recognizing that Mr. Meng's so called clarification undermined the integrity of the key ethical issue of his First Complaint."

Meng's first complaint dealt with Ruddy's testimony regarding his son's rent. Meng testified he only became aware of the inconsistency in August 2006, as he had not been able to review the tapes of the testimony until then. Until that point, although he suspected that Ruddy's testimony was inaccurate, he was not certain enough to act on it, which is why he "called upon [Ruddy] to review his testimony" and "correct it with the Court[.]" MRPC 8.3 only requires a lawyer to report another lawyer's misconduct when the reporting lawyer has *actual* knowledge of misconduct that "raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer[.]" The record indicates that Meng did not have actual knowledge of the discrepancy until significantly after the testimony. That Bar Counsel later did not "recogniz[e] that Mr. Meng's ... clarification undermined the integrity of the key ethical issue" is explainable by the simple fact that Assistant Bar Counsel agreed with Meng's understanding of what constitutes reasonable remedial measures. Although we have rejected that view, it is not so unsound as to reflect bias.

Ruddy also points to Assistant Bar Counsel's "undertaking of the unusual procedure of traveling to Mr. Meng's office in order to entertain his Response to Respondent's Reply to the First Complaint[,]" a practice that "contradicted the normal procedure" and "denied Respondent the opportunity to be made aware of Mr. Meng's Response." During oral argument, Assistant Bar Counsel explained that he only met with Meng once during the investigative stage and that it is not uncommon for Bar Counsel to meet with the complainant to obtain further information. After the investigative stage, he notified Meng in his capacity as complainant that the matter was being referred to the peer review panel, which Meng could attend.

These interactions are perfectly consistent with the procedure defined in the Maryland Rules. Maryland Rule 16–731 describes the procedure that governs the investigative process that occurs after Bar Counsel receives a complaint that is neither frivolous nor unfounded: "Bar Counsel shall make an appropriate investigation.... Bar Counsel shall ... acknowledge receipt of the complaint and explain in writing to the complainant the procedures for investigating and processing the complaint ... and (D) conduct an investigation to determine whether reasonable grounds exist to believe the allegations of the complaint." Maryland Rule 16–743 governs the Peer Review Panel procedure: "The Chair shall notify ... each complainant of the time, place, and purpose of the meeting and invite their attendance." Finally, Maryland Rule 16–723 governs confidentiality: "Upon request of a complainant, Bar Counsel may disclose to the complainant the status of an investigation and of any disciplinary or remedial proceedings resulting from information from the complainant." Assistant Bar Counsel also indicated that he spoke with Meng on the phone "at some point" about the Peer Review Panel meeting and "perhaps about some of the allegations of the complaint that were before the panel." This is insufficient evidence to conclude that Assistant Bar Counsel acted improperly.

Ruddy also alleges that Assistant Bar Counsel treated Meng's contention that Ruddy's "testimony under oath was not accurate and was not subsequently corrected by Respondent" as "presumptively binding," rather than making its own independent determination. Assistant Bar Counsel's concurrence with Meng's interpretation of the events does not mean that Bar Counsel did not act independently. Moreover, at the heart of the attorney discipline process is the separation of the prosecutorial and adjudicative functions. *See* Md. Rule 16–751 ("Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action *in the Court of Appeals.*") (emphasis added). After Bar Counsel files a Petition, a hearing judge makes factual findings and

recommended conclusions of law.[26] *See* Md. Rule 16–757. The involvement of the hearing judge and this Court as the neutral arbiters of facts and law negates a claim that any bias by Bar Counsel will undermine the result.

■ Ruddy's contention that a pattern of undue influence explains "why Bar Counsel chose to ignore Respondent's Complaint that [Meng] was utilizing the threat of filing grievances as leverage" is similarly unpersuasive. "[O]nce Bar Counsel initiate[s] an investigation after the complaint [is] received . . . he [is] duty-bound to complete the investigation[,]" *Lee,* 393 Md. at 562, 903 A.2d at 904–05, because "once the investigation begins, a complaint should be dismissed only if Bar Counsel concludes that the evidence fails to show sanctionable professional misconduct or incapacity[,]" *id.* at 561–62, 903 A.2d at 904. In a disciplinary proceeding for Ruddy, Meng's conduct would only be relevant, if at all, to the question of whether the complaint was frivolous or unfounded, a question that we answer in the negative.

■ Ruddy points to "a denial of fundamental due process [that] further evidences a deference on the part of Assistant Bar Counsel to the opinions of Mr. Meng." In a July 26, 2007, letter, Assistant Bar Counsel gave Ruddy "until August 31, 2007 to respond" to Meng's complaint about the affidavits, yet "on August 10, 2007 . . . [Bar Counsel] alleged without benefit of Respondent's Response that Respondent's Affidavits were false." A Committee Note to Maryland Rule 16–731 provides: "Before determining whether a complaint is frivolous or unfounded, Bar Counsel may contact the attorney and obtain an informal response to the allegations." Rule 16–731(c) governs

---

26. Even before Bar Counsel can file a Petition, it must present a Statement of Charges and supporting material to an independent Peer Review Panel. *See* Md. Rule 16–742. The majority of the members of the Panel must be practicing attorneys, and at least one member cannot be an attorney. *Id.* Any recommendation to the Commission must be approved by a majority of the Panel members present at the meeting and is "not subject to the approval of Bar Counsel[.]" *Id.*; Md. Rule 16–743. After receiving this recommendation, the Commission directs Bar Counsel as to the appropriate course of action. *See* Md. Rule 16–743(f).

notice to the attorney after Bar Counsel has determined that the complaint is not frivolous or unfounded:

As part of the notice, Bar Counsel may demand that the attorney provide information and records that Bar Counsel deems appropriate and relevant to the investigation. The notice shall state the time within which the attorney shall provide the information and any other information that the attorney may wish to present.

The Rules do not require that attorneys under investigation have an opportunity to respond before the investigation begins.[27]

Our independent review of the record persuades us that Ruddy's claims about Meng's inappropriate influence over Bar Counsel are unfounded. In short, our review of the record reveals that Meng recused himself from the disciplinary process, participating only in his capacity as an attorney complainant. He did not make any recommendations as to the course of the proceeding or try to influence the charges brought against Ruddy, except through his official complaints.

Ruddy's exception is overruled.

### 2. *MRPC 1.7 (Conflict of Interest)*

 Ruddy excepts to the hearing judge's conclusion that he violated MRPC 1.7, which provides, in relevant part,

---

27. Ruddy also alleges that the continuing pattern of deference "would also explain why Bar Counsel ... wasn't even made aware of the October 7, 2003, Memorandum until ... approximately ten (10) months after Bar Counsel had placed his signature on the Public Charges." We do not see how Bar Counsel can be "unduly influenced" into ignorance.

Ruddy's remaining averments of undue influence were the following: (1) Bar Counsel originally planned to leave the issue relating to the "no change" affidavits to be addressed by the Orphans' Court, but after receiving Meng's second complaint, Bar Counsel "took a complete one hundred and eighty (180) degree turn" and adopted Meng's correspondence as a "separate Complaint[;]" and (2) Assistant Bar Counsel never reviewed the Conditional Diversion Agreement file "to determine whether or not there existed any evidence that would corroborate [Ruddy's] claim ... that [Bar Counsel] had approved the loan repayment procedure." These do not persuade us that any inappropriate influence occurred.

that a lawyer "shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." The hearing judge grounded Ruddy's MRPC 1.7 violation on the following finding:

(7) That even had the respondent believed that the repayment arrangement resolved the conflict, he should have known that it could not possibly have resolved the issue of interest on the loan. That upon his opening the estate, the note was in default status and that another non-conflicted personal representative would have been duty bound to file suit against the respondent and obtain a judgment . . . or otherwise obtain interest[.]

We disagree with the hearing judge's apparent conclusion that the mere fact of Ruddy's indebtedness to the estate created a conflict of interest. *See Talbert v. Reeves,* 211 Md. 275, 279, 127 A.2d 533, 536 (1956). In *Gianakos v. Magiros,* 238 Md. 178, 186, 208 A.2d 718, 723 (1965), we explained:

If an administrator is properly appointed by the court having jurisdiction, he is not disqualified by the filing of a personal claim against the estate; nor, as administrator, is he required to avail himself of a defense of limitations against such a claim. By reason of his court appointment, *in the absence of proof of wrongdoing, he is authorized to take action which might, under other circumstances, constitute a conflict between his personal position and his fiduciary capacity.*

(Emphasis added.) Nor do we think that Ruddy was duty bound to file suit and obtain a judgment against himself. But as the hearing judge recognized, there still remains the question of interest on the loan.

Respondent should have made other arrangements for the collection of interest, such as signing a promissory note to pay interest, if only at the general legal interest rate (6% per annum). *See* MD. CONST. art. III § 57. Ruddy allowed his sister to pay back her loan the same way, but there were over thirty other interested parties who would have benefited from

the payment of interest. Accordingly, we partially sustain Ruddy's exception regarding the hearing judge's findings that the debt itself caused a conflict of interest, and that a "non-conflicted personal representative would have been duty bound to file suit against the respondent." We overrule his exception in part because he should have made some arrangement for the payment of interest.

Ruddy also excepts to the hearing judge's finding that he had no right to rely on Bar Counsel's consent to the repayment proposal, arguing that Bar Counsel is estopped because it failed to object to or later revoke the conditional diversion agreement and later terminated the agreement as complete. Similarly, Ruddy excepts to the finding that, as a seasoned attorney, he should have recognized the conflict, explaining that Bar Counsel also failed to recognize the conflict, even after a lengthy conversation about the matter. We shall overrule these exceptions.

We have consistently defined the doctrine of equitable estoppel as

> the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Cunninghame v. Cunninghame*, 364 Md. 266, 289, 772 A.2d 1188, 1201 (2001) (citation omitted). This doctrine is inapplicable to the present case. "Lawyers admitted to practice in this State are deemed to know the Rules of Professional Conduct and have the obligation to act in conformity with those standards as a requirement to practice law." *Attorney Grievance Comm'n v. Stein*, 373 Md. 531, 542, 819 A.2d 372, 379 (2003). We have also held that "an opinion of the Ethics Committee of the Bar Association is advisory, and is not binding on this Court," although "[a]s a practical matter ... where an attor-

ney can demonstrate reasonable reliance upon an ethics opinion on point, that fact is likely to have a significant effect on . . . the determination or disposition of those charges that may be filed." *Attorney Grievance Comm'n v. Gregory,* 311 Md. 522, 531–32, 536 A.2d 646, 651 (1988).

Bar Counsel's actions or statements not directly addressing the same matter are no more binding than Ethics Committee opinions. The October 2003 conversation in question occurred in the context of a Conditional Diversion Agreement that was signed in December 2001,[28] two years before Mary Fitzsimmons's death and Ruddy's subsequent appointment as personal representative, and resulted from complaints lodged in connection with the administration of the Hayes estate. The effect of a Conditional Diversion Agreement is to stay a disciplinary or remedial proceeding until satisfaction of the Agreement, at which point Bar Counsel terminates the disciplinary or remedial proceeding. *See* Md. Rule 16–736. Termination of the disciplinary or remedial proceeding, however, does not preclude further proceedings if the attorney later violates the Rules of Professional Conduct again. *See* Md. Rule 16–736. Bar Counsel's only duties regarding the Conditional Diversion Agreement were in the context of the Hayes estate, not the Fitzsimmons estate. As a result, Bar Counsel's alleged failure to raise the conflict issue when Ruddy appraised him of the proposed loan repayment procedure was not an endorsement of Ruddy's undertaking a separate repre-

---

**28.** Bar Counsel filed the memorandum he wrote to document the phone call under the same docket number as the Conditional Diversion Agreement. Indeed, because the Conditional Diversion Agreement was not terminated until 2005, it was natural for Bar Counsel to understand Ruddy's phone call to be in reference to the Conditional Diversion Agreement, which had hitherto been the basis of Bar Counsel's interactions with Ruddy. Although both Ruddy and his attorney testified that the purpose of the phone call was to resolve a potential Fitzsimmons estate conflict, Ruddy called Bar Counsel specifically because "the natural person to do that would have been [Bar Counsel] who was monitoring the CDA" and who had put the 120 day repayment provision into the promissory note—the deadline that Ruddy missed, giving rise to the question of a conflict. Ruddy explained, "[I]f there's anybody who could cure what I thought was the conflict, it was the person who put it in the note."

sentation containing the same conflict. Accordingly Bar Counsel is not estopped from subsequently raising the question of misconduct, given the purpose of attorney discipline proceedings.

Ruddy's MRPC 1.7 exception is overruled in part and sustained in part.

### *Sanction*

██ Bar Counsel recommends an indefinite suspension, arguing that "an attorney who is indebted to an estate at the time he undertakes appointment as personal representative of the estate is at serious risk of being materially limited by his own interests when attempting to carry out the representation. In this case, [Ruddy] breached his fiduciary responsibility by not repaying the $95,000.00 debt that was due and owed to his aunt's estate at the time he was appointed personal representative." Ruddy, on the other hand, argues that the charges be dismissed, citing a number of mitigating factors. We adopt neither suggestion, but instead conclude that a reprimand is appropriate.

██ In imposing sanctions, "our aim is to protect the public and the public's confidence in the legal profession rather than to punish the attorney .... [and] to deter other lawyers from violating the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 720, 955 A.2d 755, 768 (2008). These aims are best met when the sanction is "commensurate with the nature and the gravity of the misconduct and the intent with which it was committed." *Id.* Accordingly, the nature of the sanction "depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors." *Id.* We have often cited the American Bar Association's standards for imposing lawyer sanctions for guidance in imposing sanctions. *See id.* These standards suggest the consideration of four questions: "(1) What is the nature of the ethical duty violated?; (2) What was the lawyer's mental state?; (3) What was the extent of the actual or potential injury caused by the

lawyer's misconduct?; and (4) Are there any aggravating or mitigating circumstances?" *Id.*, 955 A.2d at 769. Such mitigating factors include the absence of a prior disciplinary record, character or reputation, and conduct vis-à-vis the disciplinary proceeding. *See id.* at 721, 955 A.2d at 769. The "nature of the ethical duty violated" is not on the same level as the cases that Bar Counsel cites to support his suggested sanction. In *Attorney Grievance Comm'n v. Hines*, 366 Md. 277, 783 A.2d 656 (2001), in which we suspended the respondent indefinitely, the respondent was an active director of one his corporate clients, and his law firm prepared promissory notes for a loan by the respondent's wife to the company that obligated all of the company's principals except the respondent. There, the respondent's firm confessed a judgment against the corporation while the respondent was active in the company, which was made worse when the respondent advised the company that it did not need to respond to the action in any way. The hearing judge concluded that Hines had an attorney-client relationship with his wife, the corporation and the corporation's investors, which were conflicts of interest.

In *Attorney Grievance Comm'n v. Stein*, 373 Md. 531, 819 A.2d 372 (2003), the respondent violated MRPC 1.8(c) when he drafted wills for non-family clients in which he received substantial legacies. We explained that the seriousness of the violation extends beyond conflict of interest:

> Conflict of interest, the attorney's incompetency to testify because of a transaction with the deceased, the attorney's ability to influence the testator, the possible jeopardy to probate of the entire will if its admission is contested, the possible harm to other beneficiaries and the undermining of the public trust and confidence in the legal profession are some of the dangers.

*Id.* at 538, 819 A.2d at 376. In *Stein* we quoted *Disciplinary Counsel v. Galinas*, 76 Ohio St.3d 87, 666 N.E.2d 1083, 1086 (1996), to explain the serious nature of the violation:

> Because the decisions that go into the preparation of a will are so inherently private, and because, by definition, the

testator will not be available after his death, when the will is offered for probate, to correct any errors that the attorney may have made, whether they are negligent errors or of a more sinister kind, a client is unusually dependent upon his attorney's professional advice and skill when he consults the attorney to have a will drawn. The client will have no opportunity to protect himself from the attorney's negligent or infamous misconduct.

In this case, however, Ruddy's ethical violation was his failure to make provisions for the collection of interest, the exact same arrangement he allowed for the repayment of Maureen Dwyer's loan. The inherent dangers we perceived in the *Stein* case are not present here.

The second and third questions suggested by the ABA Standards are easily disposed of because the hearing judge specifically found that "the respondent was in no way intentionally dishonest, fraudulent or deceitful," that "the conflict violation referred to above was unintentional on the part of the respondent," and that "[t]he respondent's client (the Fitzsimmons' estate) was not injured by the respondent's actions in that the interest lost on his loan was more than made up for by his numerous uncompensated hours spent repairing, renovating and selling the Lancer Drive property."

We are also mindful of the following factors:

- The hearing judge found that "[Ruddy] did believe that the arrangement had been given the blessing of the Attorney Grievance Commission." Although this belief does not satisfy his ethical obligations for the reasons previously set forth, it serves as a mitigating factor.

- Bar Counsel stated that Ruddy was cooperative throughout the disciplinary process. (Transcript 3–156)

- "[T]he respondent has never been sanctioned for his conduct in the past, and in fact the only grievances filed against him have been by his sister, brother and Mr. Meng, all resulting from his handling of the Fitzsimmons estate, or the Fitzsimmons loan which preceded it."

- Ruddy repaid the loan in part by making an early distribution to the beneficiaries and off-setting his debt against his share of the distribution.

As we discussed, Ruddy should have made arrangements for the payment of interest on the loan. Nevertheless, "we can protect the public and deter other lawyers from violating the Rules of Professional Conduct without disrupting Respondent's practice of law." *Attorney Grievance Comm'n v. Queen,* 407 Md. 556, 571–72, 967 A.2d 198, 207 (2009). In light of Ruddy's otherwise unblemished record and the other mitigating factors, we believe that this proceeding will inform Ruddy's future practice of law so that no further misconduct occurs. *See Attorney Grievance Comm'n v. Brown,* 308 Md. 219, 236, 517 A.2d 1111, 1119 (1986) ("By this proceeding [the respondent] has been warned to use care in undertaking representation in areas in which his competence is doubtful. In view of his experience and integrity, we have no doubt he will take this warning to heart, and will in future not err as he did[.]").

Ruddy is hereby reprimanded.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761. JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOSEPH C. RUDDY, JR. IN THE SUM OF THESE COSTS.**