4 A.3d 957

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Timur Z. EDIB.

Misc. Docket AG No. 28, Sept. Term, 2009.

Court of Appeals of Maryland.

Sept. 20, 2010.

**698**

Raymond A. Hein, Deputy Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

David C. Gardner, Esq. of Rockville, Maryland, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

The Attorney Grievance Commission ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Timur Ziya Edib ("Respondent"), charging him with professional misconduct arising out of his representation of his client, Gokperi Kismir, principally with regard to the sale of certain real property in Virginia. Petitioner charged Respondent with violating Rule 1.4(a) and (b) (Communication),[1] 1.16(d) (Declining or Terminating Repre-

---

1. MRPC 1.4(a) and (b) provide:

(a) A lawyer shall:

sentation),[2] 1.5(a) (Fees),[3] and 8.4(a) and (c) (Misconduct) of the Maryland Rules of Professional Conduct ("MRPC").[4] The

---

    (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

    (2) keep the client reasonably informed about the status of the matter;

    (3) promptly comply with reasonable requests for information; and

    (4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

    (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**2.** MRPC 1.16(d) provides:

    (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers related to the client as permitted by other law.

**3.** MRPC 1.5 provides:

    (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

    (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

    (1) the fee customarily charged in the locality for similar legal services;

    (4) the amount involved and the results obtained;

    (5) the time limitations imposed by the client or by the circumstances;

    (6) the nature and length of the professional relationship with the client;

    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    (8) whether the fee is fixed or contingent.

**4.** MRPC 8.4 provides:

    It is professional misconduct for a lawyer to:

Honorable Thomas L. Craven of the Circuit Court for Montgomery County, acting as our hearing judge, made findings of fact and conclusions of law regarding the matter. Judge Craven concluded, after conducting an evidentiary hearing, that Respondent did not violate MRPC 1.5(a) or MRPC 8.4(c), but that he violated MRPC 1.16(d) and 1.4, both of which established an MRPC 8.4(a) violation as well.

## I.

### Judge Craven's Findings of Fact

Edib was admitted to practice law in Maryland on 12 December 1998. He maintains a law office in Maryland. The thrust of his practice is the representation of Turkish nationals immigrating to, or having business in, the United States. Respondent is fluent in Turkish and maintains dual U.S./Turkey citizenship. The Turkish Consulate in Washington, D.C., sometimes refers people to Respondent, as was the case with Ms. Kismir.

The complaint giving rise to these proceedings was lodged by Gokperi Kismir, Respondent's former client. Ms. Kismir, a resident of Turkey, is the surviving sister of Mr. Gokperi Kismir ("Decedent"). Decedent resided in Alexandria, Virginia, dying there in May 2005. Ms. Kismir and Decedent apparently did not have a close relationship over the years and the miles. Consequently, she was uncertain whether she was truly his sole heir. Ms. Kismir sought legal assistance in the United States by contacting the Turkish Consul, who referred her to Respondent. After some investigative work, Respondent determined that Ms. Kismir, indeed, was Decedent's sole heir and that she held thereby marketable title to three pieces of real property in Northern Virginia as part of her inheritance. The circumstances surrounding the sale of one of these

---

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct . . . ;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

properties and the conduct of Respondent after he was terminated as her counsel forms the basis for the allegations against Respondent.

Respondent agreed to meet Ms. Kismir at the airport upon her arrival in the U.S. on 13 July 2006. Before the meeting occurred, however, the Turkish Consul put Respondent in contact with a Mr. Bekir Cakmak. Bekir Cakmak apparently knew Decedent to some extent during his life. He also advanced Decedent's funeral expenses. Bekir Cakmak gave Respondent several addresses of real property in Northern Virginia that Decedent may have owned, as well as names of several of Decedent's other acquaintances. Respondent spoke with these acquaintances, learning that Decedent had been married (no children), but divorced. He had one or more ex-girlfriends, but no children by them. Ms. Kismir indeed was Decedent's sole heir. Respondent also learned, after consultation with a Virginia lawyer, that Virginia law provided that any real estate owned by Decedent at his death passed directly to Ms. Kismir outside of probate.[5] Respondent determined that the real estate consisted of two condominium apartments and one house, all in Northern Virginia.

Upon Ms. Kismir's arrival in the U.S., Respondent informed her of what he learned. He also told her he was not admitted to practice law in Virginia. Ms. Kismir, nonetheless, insisted that Respondent represent her in all matters regarding her brother's death and estate. Additionally, she told Respondent that she wanted his assistance with other matters, such as locating family rings that she believed belonged to her, but had been in Decedent's possession, as well as with her recently deceased father's estate.

In short, Ms. Kismir presented Respondent with a wide range of issues—some involving the practice of law and others not implicating the need for legal training necessarily. The

---

**5.** We express no opinion as to whether this is a correct interpretation of Virginia Law. The hearing judge made this finding of fact, however, and because it is not contested by the parties, we will treat it as established. *See* Md. Rule 16–759(b)(2)(A).

amount of time and effort that would be required to resolve the matters concerning Decedent's assets (probate and nonprobate), to advise and assist Ms. Kismir in managing and disposing of those assets, and in performing the other tasks she required, was entirely unknown at the inception of this relationship. Moreover, Ms. Kismir had very little money and was unable to afford a retainer fee for Respondent.

Notwithstanding the numerosity and range of the tasks before him, Respondent agreed to represent Ms. Kismir in all of the matters she requested. Respondent and Ms. Kismir signed two contracts on 15 July 2006. The first contract set Respondent's fee for serving as administrator of the probate estate.[6] The second contract related to Respondent's services in representing Ms. Kismir concerning the other matters. This contract had a provision that established Respondent's compensation "based on the greater of either Three Hundred Dollars ($300.00) per hour for services rendered or a flat legal commission of fifteen percent (15%) of the gross value for all assets (personal or real property) received and handled through my office or escrow account for your benefit." Although the contracts were written in English, the discussions between the two, both before contract execution and thereafter, primarily were in Turkish. Judge Craven found that Ms. Kismir understood the agreements and that the terms were fair and reasonable under the circumstances.

Judge Craven also found that Respondent expended considerable time and effort fulfilling his duties as both the administrator of the probate estate and with regards to the disposition of the non-probate real property. Pursuant to his duties as the administrator, Respondent spent a day in New York and

---

6. *Black's Law Dictionary* 712 (9th ed.2009) defines Probate Estate as "[a] decedent's property subject to administration by a personal representative. The probate estate comprises property owned by the decedent at the time of death and property acquired by the decedent's estate at or after the time of death." In the present case, as noted *supra,* Decedent's real property apparently was exempt from probate under Virginia law. Therefore, Respondent was not acting as an administrator with respect to the disposition of the real property.

another in Northern Virginia, inquiring of banks within walking distance of Decedent's previous workplace and residence, respectively, regarding deposit boxes and accounts he may have maintained. Respondent also negotiated with tenants in the real properties and investigated Decedent's brokerage accounts. Finally, the hearing judge found that, at Ms. Kismir's insistence, Respondent accompanied Ms. Kismir on various personal errands while she was in the U.S.

At some point in mid-Summer of 2006, Ms. Kismir decided she wanted to liquidate promptly the real estate. Edib retained Turan Tumbal as the real estate broker (Bekir's occupation) for these tasks. Respondent advised Ms. Kismir that she should sell the two apartments for just under $300,000, even though their fair market value was greater. This recommendation was intended to avoid a significant tax withholding that would have applied to a sale if the amount were greater than $300,000. Specifically, the goal was avoidance of the Foreign Investment in Real Property Tax Act ("FIRPTA"), 26 U.S.C. § 1445 (2006 & Supp. II 2008). This Act compels the withholding of 10% of the value of real property that is sold for greater than $300,000 if it is sold by a foreigner. *See id.* Ms. Kismir agreed to sell these properties for just under $300,000.

At a dinner meeting with Respondent and Cakmak, Ms. Kismir announced her intention to sell the house to Cakmak for below market value, but over $300,000. Ms. Kismir agreed to the below market sale in recognition of Cakmak's assistance in burying Decedent and helping to sort out his affairs. Respondent protested her decision, to no avail.

Two of Ms. Kismir's later complaints to the Commission arose from this transaction. First, she claims that Tumbal waived orally in her presence his 6% brokerage fee because it was a direct sale between Kismir and Cakmak. At settlement, however, without objection from Respondent, the title company paid Tumbal a 6% commission on the total sales price,

amounting to approximately $23,000.[7] Respondent's failure to object, and failure later to recover the commission from Tumbal, is one source of Ms. Kismir's dissatisfaction with Edib's representation of her. The second source of dissatisfaction is that the FIRPTA tax that was avoided on the sale of the two apartments was not avoided on the sale of the house. Respondent alleges that the tax withheld is recoverable upon filing the appropriate tax return, but it appears that neither he nor Ms. Kismir took action to accomplish this (including Ms. Kismir's new attorney engaged after Edib's termination).

Respondent received a total of $143,970 in fees disbursed from the proceeds of the sales of the three Virginia properties. In each transaction, Respondent received 15% of the sales price, according to his contract with his client. In the Fall of 2006, after the settlement on the real estate, Decedent's probate estate remained open, consisting primarily of $140,000 in cash. Respondent did not distribute the net estate to Ms. Kismir without first paying Decedent's debts. After the debts were paid, the probate estate contained approximately $93,000 and Respondent was in a position to close the estate and make a final distribution.

Ms. Kismir inquired of Respondent on several occasions regarding the status of the probate estate and complained about the disputed real estate commission on the house sale. Respondent told Ms. Kismir that he was unable to make significant distributions from the estate at that time and also failed to further pursue recovery of the real estate commission. Frustrated with this, Ms. Kismir retained another attorney and, by letter of 22 June 2007, fired Respondent. Throughout the summer of 2007, by correspondence, email, and telephone, her new attorney demanded that Respondent provide copies of documents relating to the estate and to Respondent's representation of Ms. Kismir. Respondent was almost entirely unresponsive to and uncooperative with this

---

7. Only the final figure of $23,000 is disclosed in the hearing judge's findings of fact; however, the parties agree that the $23,000 is derived from a 6% real estate broker's fee of the sales price.

request, stating that Ms. Kismir had all of the documents to which she was entitled.[8]

## II.

### Conclusions of Law

Judge Craven determined that Respondent violated MRPC 1.16(d) based on his failure to surrender papers to Ms. Kismir (or her new attorney) after she terminated his employment.[9] Judge Craven concluded that Ms. Kismir was entitled to the requested documents because she was a former client, as well as the sole heir to the Decedent's Virginia estate, which Respondent continued to administer. Finally, the hearing judge stated that "based on the same facts, the court also finds that Respondent has failed to properly communicate with his client." Therefore, the failure to surrender papers also amounted to a violation of MRPC 1.4(a) and (b).

As to the charge of violating MRPC 1.5(a), however, Judge Craven concluded that Petitioner had not met its burden of persuasion by clear and convincing evidence that Respondent charged unreasonable fees.[10] He reasoned that:

Ms. Kismir had presented Respondent with a complicated and difficult situation, the outcome of which was very uncertain. They negotiated a fee arrangement which she understood and which was reasonable under the circumstances. Respondent substantially complied with Ms. Kismir's requests and obtained the results she desired and expected,

---

**8.** Judge Craven commented in a footnote in his findings of fact that the new attorney had been the subject of a complaint by Respondent to Bar Counsel in the District of Columbia. Judge Craven stated that this "might have contributed" to the new lawyer facilitating the filing of Ms. Kismir's complaint with the Commission.

**9.** MRPC 1.16(d) states that "[u]pon termination of representation, the lawyer shall take steps to the extent reasonably practicable to protect a client's interests...."

**10.** Md. Rule 16–757(b) states that "(b)The petitioner has the burden of proving the averments of the petition by clear and convincing evidence."

except that he failed to actively pursue a waiver or return of the real estate brokerage commission.

Finally, the hearing judge resolved that Respondent did not violate MRPC 8.4(c) because his conduct did not involve dishonesty, fraud, deceit, or misrepresentation, but that Respondent violated MRPC 8.4(a), predicated on the MRPC 1.4 and 1.16(d) violations.

## III.

### Exceptions

Both Petitioner and Respondent took written exceptions to the hearing judge's conclusions of law. Petitioner tendered a single exception to the hearing judge's conclusion that Respondent did not violate MRPC 1.5(a). Respondent advanced exceptions to the hearing judge's conclusions that Respondent violated MRPC 1.16(d) and 1.4(a) and (b).[11] No party took exceptions as to the findings of fact. Thus, we treat the facts as established conclusively. *See* Md. Rule 16–759(b)(2)(A) ("If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.").

### A.

#### *Standards of Review*

This court has original and complete jurisdiction over attorney disciplinary proceedings. *Attorney Griev. Comm'n v. Thomas*, 409 Md. 121, 147, 973 A.2d 185, 200 (2009). At the evidentiary hearing, Bar Counsel had the burden of proving his allegations in the disciplinary petition by clear and convincing evidence. *See* Md. Rule 16–757(b). "We accept a hearing judge's findings of fact unless we determine that they are clearly erroneous." *Attorney Griev. Comm'n v.*

---

11. In the event we were to overrule all of the exceptions, the parties agree that the appropriate sanction urged upon the Court is a reprimand. We will consider any sanction and this recommendation anon.

*Guida,* 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006). "This deference accorded to the hearing judge's findings is appropriate, in part, because the fact finder is in the best position to assess the demeanor-based credibility of a witness." *Id. See also* Md. Rule 16–759(b)(2)(B). Findings of fact to which neither party takes exception may be treated by us as conclusively established. *See* Md. Rule 16–759(b)(2)(A) ("If no exceptions are filed, the Court may treat the findings of fact as established...."). "All proposed conclusions of law by the hearing judge, however, are subject to *de novo* review by this Court." *Thomas,* 409 Md. at 147, 973 A.2d at 201 (citing *Attorney Griev. Comm'n v. Ugwuonye,* 405 Md. 351, 368, 952 A.2d 226, 236 (2008)); Md. Rule 16–759(b)(1).

## B.

### *Petitioner's Exception*

■ Petitioner submits that Respondent charged an unreasonable fee and should be held accountable for a violation of MRPC 1.5(a).[12] Petitioner's first and strongest argument is that Respondent's fee was unreasonable because he collected the agreed upon 15% on the sale price of the house and allowed Tumbal to receive a 6% real estate commission on the sale. Petitioner alleges that the fee is unreasonable because a services retainer agreement containing "contingent elements unknown" at the time the agreement is made "may become unreasonable in light of the changed facts and circumstances." *Attorney Griev. Comm'n v. Pennington,* 355 Md. 61, 74, 733 A.2d 1029, 1036 (1999) (citing *Attorney Griev. Comm'n v. Korotki,* 318 Md. 646, 664–65, 569 A.2d 1224, 1233 (1990)). Petitioner argues essentially that a 15% charge may have been reasonable initially, but became unreasonable in light of the fact that it is in addition to, rather than in lieu of, the 6% real estate broker's commission.

---

12. MRPC 1.5(a) provides that "[a] lawyer shall not make an agreement for, or collect an unreasonable fee or an unreasonable amount for expenses."

Petitioner's reliance on *Pennington* is misplaced. Concededly, the *Pennington* Court endorsed the proposition that a contingent fee should be re-evaluated after the fee is quantifiable, which paradigm does apply to the case at hand. Before the fee itself is analyzed, however, Petitioner's paraphrasing and quotation from *Pennington* must be examined in context.

Where the *Pennington* court made the statement that Petitioner relies on, it is important to note that the Court stated that "*Korotki* teaches, however, . . . that an agreement . . . may become unreasonable in light of the changed facts and circumstances. . . ." *Pennington*, 355 Md. at 74, 733 A.2d at 1036 (citing *Korotki*, 318 Md. at 664–65, 569 A.2d at 1233). In *Korotki*, we held that the attorney violated MRPC 1.5(a) when he coerced clients into signing a new fee arrangement in anticipation of an appeal. Korotki initially entered into an agreement with his clients to receive one-third of any settlement reached before trial and 40% of any award achieved at trial, plus costs. When the trial court judgment was appealed to the Court of Special Appeals, Korotki had his clients sign an "Appellate Fee Agreement," which authorized a 20% increase in his fees. Korotki told his clients that he would no longer represent them if they did not sign the new agreement. When the case reached this Court, Korotki again held a meeting at which he threatened to withdraw his representation unless the clients agreed to an additional 15% increase in his fees. We found that "Korotki engaged in fee gouging, 'which brings the legal profession into disrepute. . . .' " *Korotki*, 318 Md. at 671, 569 A.2d at 1237 (quoting *Attorney Griev. Comm'n v. Kerpelman*, 292 Md. 228, 244, 438 A.2d 501, 510 (1981)). This conclusion was based on the hearing judge's findings that Korotki coerced an increase in fees:

(1) by threatening to terminate his representation, (2) by representing that, in that event, the clients would owe Korotki the full fee provided by the then current agreement (forty percent and later, sixty percent), and (3) by further representing that the clients, in order to obtain substitute counsel, would have to pay substitute counsel an additional

fee, ranging from thirty-three and one-third percent to forty percent.

*Korotki,* 318 Md. at 669, 569 A.2d at 1235.

We suspended Korotki from the practice of law for eighteen months, characterizing his misconduct as "a particularly aggravated case of greed overriding professionalism. . . ." *Id.* at 649, 569 A.2d at 1226. Thus, when the *Pennington* Court paraphrased *Korotki,* stating that an agreement "may become unreasonable in light of the changed facts and circumstances[,]" the "changed facts and circumstances" it alluded to were Korotki's repeated coercive tactics that he employed to increase his fees. *Pennington,* 355 Md. at 74, 733 A.2d at 1036.

In Edib's case, the "changed facts and circumstances" occurring since the inception of the representation is represented by the 6% real estate broker's commission, which Ms. Kismir alleged was unexpected. Respondent, unlike Korotki, never attempted to increase his fees beyond his 15% contingent fee. The fact that Ms. Kismir did not receive a discount on the brokerage commission, which she claimed Tumbal promised her, stands in contrast to the calculated attorney misconduct in *Korotki.*

Petitioner also argues that Respondent's 15% contingent fee was excessive because the client paid it in addition to the 6% brokerage fee for selling the house. *Pennington* provides a legal proposition, however, that undermines this argument. The size of a contingent fee is not dispositive necessarily in determining whether there has been a violation of MRPC 1.5(a); rather, the Court should consider other factors, such as the purpose of the undertaking. *Id.* at 75, 733 A.2d at 1036. In *Pennington,* the attorney represented her client in an employment discrimination action. *Id.* The client alleged that her employer discriminated against her by failing to promote her from a sales position to a management position. *Id.* The client made it clear to Pennington that her principal objective was to acquire the management position, although she sought monetary compensation from the employer as well. *Id.* Pen-

nington's retainer agreement established a contingent fee because the client had little money at the time. *See id.* It provided that Pennington would receive 40% of all sums acquired after suit is filed, in addition to $5,000 if the client's income becomes greater than $40,000 per year. *Id.* at 67, 733 A.2d at 1032. The client settled with the employer after suit was initiated, receiving $25,000 and a management position that paid in excess of $40,000 per year. *Id.* Pennington took $15,000 as attorney's fees. *Id.*

The hearing judge found that Pennington violated MRPC 1.5(a). In the findings of fact and conclusions of law, the hearing judge reasoned that the fee was reasonable when agreed upon because "both ... the result and the means to the result [were] unknown[.]" *Pennington,* 355 Md. at 68, 733 A.2d at 1032 (second alteration in original). The hearing judge went on to state, however, that the actual fee taken was not reasonable because " 'it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake.' " *Id.* (quoting *Korotki,* 318 Md. at 665, 569 A.2d at 1233). In finding a violation of MRPC 1.5(a), the hearing judge stated that "[n]othing has been presented to this court which would justify that line being crossed in this case." *Id.* at 68, 733 A.2d at 1033.

We did not adopt the hearing judge's conclusions in this regard. We rejected the idea that any fee greater than the client's award was unreasonable per se. *Id.* at 75, 733 A.2d at 1036. We pointed out also that MRPC 1.5(a)(4) recognizes that both the amount at issue and the result achieved should be considered when determining whether a fee is unreasonable.[13] *See* MRPC 1.5(a)(4). Thus, the fact that Pennington received 60% of the monetary settlement did not amount to a MRPC 1.5(a) violation because the purpose of the litigation

---

**13.** MRPC 1.5(a)(4) provides that one factor in consideration of whether a fee is reasonable is "the amount involved *and the result obtained.*" (emphasis added).

was achieved when Pennington's client was offered a management position.[14]

Applying that rationale to Edib's case, the fact that he charged and received from Ms. Kismir his full 15% fee, in addition to her having to pay Bekir the 6% brokerage fee, does not amount to a MRPC 1.5(a) violation for several reasons. First, the 6% paid to Tumbal is not part of an analysis of whether Respondent had a larger stake in the outcome of the undertaken services than Ms. Kismir. Second, Ms. Kismir obtained substantially the result that she desired. Respondent liquidated her real estate in a timely manner. The fact that Ms. Kismir was charged both a 6% broker's fee, as well as a 15% fee based on Respondent's contingent fee agreement, did not persuade Judge Craven, and does not persuade this Court, by clear and convincing evidence, that a violation of MRPC 1.5(a) occurred.

Petitioner's second argument in support of its exception is that Respondent violated MRPC 1.5(a) because his 15% fee was in excess of the Virginia "Fee Schedule for Executors and Administrators." Virginia Code § 26–30 states that an executor or administrator may receive "reasonable compensation," but does not define what "reasonable compensation" is or how it may be determined. *See* Va.Code. Ann. § 26–30 (2010). Petitioner relies on the "Fee Schedule for Executors and Administrators," promulgated by the Virginia Office of Commissioner Accounts. This states that, "in the absence of unusual circumstances," it ordinarily allows 5% on the first $500,000, and 4% on the next $500,000 to be charged to any client by an attorney rendering services as an executor or administrator in Virginia. John H. Rust, Jr., Commonwealth of Va., *Fiduciary Compensation Schedule for Executors and Administrators* 1 (2007). Petitioner argues that, even though Ms. Kismir's property passed to her outside of probate, this fee schedule is a relevant consideration in assessing the reasonableness of Respondent's fees in light of both MRPC

---

14. The initial 40% contingency fee, in addition to the fixed fee of $5,000, amounted to 60% of the total recovery.

1.5(a)(3) and *Attorney Griev. Comm'n v. Kendrick,* 403 Md. 489, 507, 943 A.2d 1173, 1183 (2008) (stating that Md.Code (1974, 2001 Repl.Vol.) Est. & Trusts, §§ 7–601, 7–602, 7–603, and 7–604 "set forth a framework for the reasonable allowance of compensation for the personal representatives(s) and/or the attorney(s) of an estate."). We shall consider each authority in turn.

Petitioner misapprehends the application of *Kendrick* to the present case. In *Kendrick,* this Court concluded that the attorney violated MRPC 1.5 because he charged his client more than the permissible amount under § 7–601 of the Estates and Trusts Article. An attorney is only allowed to charge in excess of this section if he obtained prior court approval or notified the creditors of the estate that he proposed to do so. *See* § 7–604(a) (allowing an attorney to take a reasonable fee from the estate if all creditors consent in writing); § 7–602(b) (requiring the attorney to seek leave of the court when billing attorney's fees). *Kendrick* established that a Maryland attorney working on a Maryland estate violated Maryland testamentary law, which was the basis for finding that the attorney violated MRPC 1.5(a). *See Kendrick,* 403 Md. at 508, 943 A.2d at 1184 ("We hold that the acceptance of these payments by Respondent without court approval and without compliance with the requirements set forth in § 7–604, violated Rule 1.5.").

Respondent here was not administering an estate when he sold the real property for Ms. Kismir because the properties passed directly to her upon her brother's death, outside of probate. Accordingly, there was no violation of the Virginia authorities in this case. *Kendrick* does not persuade us that Respondent's fee was unreasonable. Although *Kendrick* referred to the Maryland fee schedule as a "framework for the reasonable allowance of compensation," the Maryland fee schedule in *Kendrick* served only as applicable and authoritative Maryland law. *Kendrick,* 403 Md. at 507, 943 A.2d at 1183. The Court referred to the code as a "framework" because it provided strict rules regarding how much an attorney could charge related to the value of a decedent's estate.

The Court was not suggesting that this was a "framework" insofar as it should be used to indicate what reasonable compensation is in any instance regarding the disposition of real estate. The Court observed simply that these statutes specifically define what reasonable compensation is in Maryland for an estate administrator.[15] Once the Court determined in *Kendrick* that the attorney violated the statute, it was clear that the fee was unreasonable. Because the circumstances in *Kendrick* are distinguishable from those in Edib's case, we do not find the Commission's argument persuasive.

Petitioner cites MRPC 1.5(a)(3) as authority in support of its argument that if Respondent charged in excess of the Maryland fee schedule for the compensation due to an estate administrator, Respondent's fee was unreasonable. MRPC 1.5(a)(3) states that a consideration whether a fee is unreasonable is "the fee customarily charged in the locality for similar legal services...." MRPC 1.5(a). As noted previously, however, Respondent was not acting as an estate administrator when he sold the properties. Therefore, the Maryland fee schedule for an estate administrator does not bear heavily on our analysis under MRPC 1.5(a)(3) because the sale of property and the administration of an estate, where conducted separately, are not sufficiently analogous legal services.

Petitioner's third and final argument is that any fees charged by Respondent for the liquidation of the real estate are unreasonable, alleging that Respondent performed no actual "legal services" in doing so. This argument is unpersuasive as well. MRPC 1.5 makes no mention of "legal services." MRPC 1.5 only implicates attorneys who "make an agreement for, charge, or collect an unreasonable fee[.]" An attorney is entitled to a reasonable fee whether he or she is performing "legal services" per se. As we stated in *Page v. Penrose:*

---

15. Section 7–601(a) states that "[a] personal representative or special administrator is entitled to reasonable compensation for services." The section goes on to provide strict percentage allowances for fees depending on the value of the estate. *See* § 7–601.

> Mr. Penrose was employed as a lawyer . . . but it is difficult to point out any services rendered by him which could not have been rendered in ordinary course by a capable and experienced bank executive. . . .
>
> *     *     *
>
> [W]hile his services may not, and so far as we can see were not, of a strictly legal character, nevertheless, it is just that he should have been compensated for the services he gave at the same rate as he would have been had they been strictly legal in character.

147 Md. 225, 225, 127 A. 748, 749 (1925).

We hold alternatively that Respondent did not violate MRPC 1.5(a) based on a weighing of its applicable factors. The fact that the time and labor involved in dealing with Ms. Kismir's various requests, ranging from asset liquidation to finding lost property, was unknown at the inception; that Respondent achieved his client's desired result (the liquidation of real property); and, that Respondent was particularly capable of performing the services required by Ms. Kismir,[16] all bear on MRPC 1.5(a)(1), (4), and (7), respectively, and suggest that Respondent's fee was reasonable. There is no evidence bearing on the other factors.

MRPC 1.5(a)(1) provides that the first factor to be considered in determining the reasonableness of a fee is "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly[.]" In the findings of fact, Judge Craven found that the amount of time and labor were unknown to Respondent at the inception, yet he agreed nonetheless to represent Ms. Kismir. Although the novelty of the questions and tasks involved may not have been significant, the difficulty in detecting what property Decedent owned proved to be challenging, requiring Respondent to walk door-to-door to banks in locations in at least two states in search of assets, and on more

---

**16.**  The hearing judge found that Respondent was "uniquely equipped to perform" what Ms. Kismir asked of him.

than one occasion. This factor augurs in favor of concluding that Respondent's fee was reasonable.

MRPC 1.5(a)(4) provides another factor to be considered, "the amount involved and the results obtained[.]" Judge Craven found that "Respondent ... accomplished most of what [Ms. Kismir] had expected of him, much of which he was uniquely equipped to perform." Therefore, it is clear that the "results obtained" were largely what Ms. Kismir desired. This finding also bears on MRPC 1.5(a)(7), which provides as a relevant factor "the experience, reputation, and ability of the lawyer or lawyers performing the services[.]" The hearing judge found that Respondent was "uniquely equipped" to handle Ms. Kismir's needs. Respondent's ability to communicate in Turkish and English in pursuing Ms. Kismir's multitudinous requests also supports the conclusion that Respondent's fee was reasonable.[17]

We overrule Petitioner's exception.

## C.

### *Respondent's Exceptions*

█ Respondent takes exception to the conclusion that he violated MRPC 1.16(d).[18] Respondent states that although he "may have violated ... Rule 1.16(d) when he failed to turn over his former client's file to [Ms. Kismir's new attorney]," he did not fail actually to give his client any documents that she

---

**17.** Although not part of Judge Craven's findings, Edib testified that he performed an after-the-fact computation of the estimated number of hours he worked across his representation of Ms. Kismir. The total, he represented, was in the neighborhood of 341 hours.

**18.** MRPC 1.16(d) provides:

   (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

needed to protect properly her interests. Respondent alleges that MRPC 1.16(d) does not require a lawyer to give a copy of every relevant document, only documents that the client could show were needed to protect the client's rights or that would prejudice the client otherwise if the client was without them. In the present case, Respondent alleges that he did not turn over the documents, even though Ms. Kismir's new attorney requested them, in his belief that Ms. Kismir had all of the documents she "needed or was entitled to receive to understand these transactions."

MRPC 1.16(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... surrendering papers ... to which the client is entitled...." MRPC 1.16(d). Although the Rule requires the client to be entitled to the papers before an attorney's obligation to surrender them is triggered, there is no explicit requirement that the implicated papers must be necessary to protect the client's rights or otherwise. Based on a plain reading of the Rule, if the client is entitled to the papers then the attorney must take reasonable and practicable steps to surrender them. Here, the client was entitled to the documents because she was a former client and the sole heir to the estate that the Respondent administered. The hearing judge found that "Respondent was almost entirely unresponsive and uncooperative ..." in this regard. Neither party took exception to this factual finding, thus, the Court treats it as established conclusively. Md. Rule 16–759(b)(2)(A). We resolve that the refusal to surrender the requested papers constitutes a failure to take reasonable and practicable steps to protect the client's interest, which is a violation of MRPC 1.16(d).

This Court, in *Attorney Griev. Comm'n v. Ober,* 350 Md. 616, 714 A.2d 856 (1998), found a violation of MRPC 1.16(d), even after a lawyer turned over the requested documents. The *Ober* Court found that the attorney violated MRPC 1.16(d) because he "agreed to meet with [the new attorney] ... to bring [the client's] file to go over it, but he never did so." *Id.* at 623, 714 A.2d at 860. Apparently, the attorney

had lost the file on the client's case. *Id.* The former lawyer then, over a year-long period, reconstructed the client's file and turned it over to the new lawyer. *Id.* The hearing judge found the new case file to be "complete and in good order." *Id.* at 624, 714 A.2d at 860. Nevertheless, this Court held that the delay was a violation of MRPC 1.16(d) because it was a failure to take reasonable and practicable steps to protect the client's interests. *Id.* It stands to reason, therefore, that the facts before us in Edib's case suffice to establish a similar violation, being that the documents in question were never turned over to the client.

Respondent also takes exception to Judge Craven's conclusion that he violated MRPC 1.4 for failing to surrender the documents in question. Judge Craven concluded that "based on the [failure to deliver requested documents], the court also finds that Respondent has failed to properly communicate with his client." Respondent argues essentially that MRPC 1.4 is inapplicable here. MRPC 1.4 is only implicated, he asserts, if an attorney fails to communicate with a "client." Because Ms. Kismir terminated his representation of her before the contretemps with her new counsel, as his exception goes, he could not have violated MRPC 1.4. The attorney-client relationship no longer existed.

Judge Craven noted, however, that Respondent continued to administer Decedent's estate, of which Ms. Kismir was the sole heir.[19] Even if Ms. Kismir was not Respondent's client technically, we have held that an attorney may be in violation of MRPC 1.4 based on misconduct occurring after the termination date. For instance, in *Attorney Griev. Comm'n v. Logan,* 390 Md. 313, 888 A.2d 359 (2005), the hearing judge found that, "on September 5, 2003, the [attorney] advised [the client] that he was terminating their attorney-client relationship." *Id.* at 318, 888 A.2d at 362. The attorney never contacted the client again and failed to return original documents to the client. *Id.* In finding that the attorney violated

---

19. Neither party contests this.

MRPC 1.4 (among others), we held that "upon our *de novo* review of the hearing court's conclusions of law ... we are satisfied that they follow from, and are supported by, the court's factual findings...." *Logan* suggests that Respondent should not be exempt from the ethical requirements of MRPC 1.4 solely because Ms. Kismir recently terminated his representation with regard to the sale of her real estate. MRPC 1.4 applies here.

It is clear that Respondent failed to "promptly comply with reasonable requests for information...." MRPC 1.4(a)(3). A plain reading of MRPC 1.4(a)(3), in addition to the uncontroverted fact that Respondent failed to surrender documents to which Ms. Kismir was entitled, persuades us, by clear and convincing evidence, that Respondent violated MRPC 1.4.

In light of the above, Respondent violated MRPC 8.4(a) as well because "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the Maryland Lawyers Rules of Professional Conduct...." MRPC 8.4(a). Accordingly, Respondent's exceptions are overruled.

## IV.

### Sanction

Both Petitioner and Respondent submit that if this Court concludes that Respondent violated only MRPC 1.4, 1.16(d), and 8.4(a), the appropriate sanction necessary to protect the public is a reprimand. As tempting as it may be to accept without further ado this recommendation, we shall consider the sanction in a reasoned analysis.

As this Court stated in *Attorney Griev. Comm'n v. Ruddy*, 411 Md. 30, 76, 981 A.2d 637, 664 (2009), when the Court imposes a sanction for a violation of the Rules of Professional Conduct:

'our aim is to protect the public and the public's confidence in the legal profession rather than to punish the attorney....' *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 720, 955 A.2d 755, 768 (2008). These aims are best met

when the sanction is 'commensurate with the nature and the gravity of the misconduct and the intent with which it was committed.' *Id.* Accordingly, the nature of the sanction 'depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors.' *Id.* We have often cited the American Bar Association's standards for imposing lawyer sanctions for guidance in imposing sanctions. *Id.* These standards suggest the consideration of four questions: "(1) What is the nature of the ethical duty violated?; (2) What was the lawyer's mental state?; (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?; and (4) are there any aggravating or mitigating circumstances?" *Id.* [at 720,] 955 A.2d [at] 769. Such mitigating factors include the absence of a prior disciplinary record, character or reputation, and conduct vis-a-vis the disciplinary proceeding. *See id.* at 721, 955 A.2d at 769.

Thus, the first factor we consider is the nature of the ethical duty breached. The Court discussed what is a core ethical duty in *Attorney Griev. Comm'n v. Fallin,* 371 Md. 237, 808 A.2d 791, 792 (2002). In *Fallin,* we suspended the attorney for failing to pursue diligently is clients' cases. *Id.* We subsequently disbarred Fallin after Bar Counsel submitted a series of complaints alleging that the attorney took fees from three other clients, while he was suspended, and failed to provide competent representation. *Id.* Fallin did not challenge the complaints. *Id.* When we disbarred him, we characterized his violation as one that goes "to the very heart of the attorney client relationship and the public's faith in the administration of justice." *Id.* at 239, 808 A.2d at 792 (quoting *Attorney Griev. Comm'n v. Fallin,* Sept. Term. 1999, No. 55.) (slip op. at 11). Although Respondent's behavior here is not commendable, the ethical duty to surrender documents upon termination of representation is not as important in protecting the public as the misconduct in *Fallin,* which implicated a lawyer's duty to provide honest and competent representation.

We consider next the lawyer's mental state of mind regarding the misconduct. Judge Craven suggests that Respon-

dent's misbehavior was prompted by his sour relationship with Ms. Kismir's new attorney. The hearing judge noted that this "prior, unrelated contact might have contributed to Respondent's inappropriate failure to cooperate and to the new lawyer procuring the filing of this Complaint." This suggests that Respondent's failure to surrender documents was intentional.

It is important to note, however, that the hearing judge concluded that "the Respondent did not ... engage[ ] in conduct involving dishonesty, fraud, deceit, or misrepresentation." In the past, we made clear that in cases involving moral turpitude, or its equivalent, we will seek the most severe sanction, unless there are "compelling extenuating circumstances." *Attorney Griev. Comm'n v. Vanderlinde,* 364 Md. 376, 390, 773 A.2d 463, 471 (2001). In *Attorney Griev. Comm'n v. Ugwuonye,* 405 Md. 351, 952 A.2d 226 (2008), a finding similar to that of the hearing judge in the present case was made, that there was a lack of deceitful intent. The *Ugwuonye* Court stated that "[i]n the case at hand, the evidence does not support the notion that Respondent harbored dishonest or deceitful motives in his representation...." *Id. Ugwuonye* made clear that, in fashioning a sanction, we should consider whether Respondent harbored dishonest motives. *See id.* at 374, 952 A.2d at 239. Although Edib may have withheld documents intentionally, he did not do so with dishonest or deceitful motive as regards his client. Thus, a less severe sanction is appropriate.

The third factor under *Ruddy* is the extent of actual or potential injury caused by the lawyer. Bar Counsel does not allege that Respondent's failure to surrender documents caused any specific injury to Ms. Kismir. As for the FIRPTA withholding, Respondent contends that her current lawyer (or an accountant) still may recover the withholding from the IRS upon making the appropriate filing.[20] The real estate broker's

---

20. Petitioner does not challenge this contention. No one has called to our attention any applicable limitations period for seeking a refund.

fee paid to Tumbal cannot be considered an "injury" because it was not caused directly by Respondent.[21]

*Fallin* and *Ugwuonye* exemplify those cases in which an attorney's actions caused actual harm. In *Fallin*, the attorney kept client fees without providing competent counsel and delayed any hope of remedy for the clients. *See Fallin*, 371 Md. at 240, 808 A.2d at 793. This caused actual injuries to the client, warranting the attorney's disbarment. *Id.* at 243, 808 A.2d at 794. In *Ugwuonye*, the attorney took retainer fees from clients, but never pursued their cases. *Ugwuonye*, 405 Md. at 372, 952 A.2d at 238. Not only did Ugwuonye harm the client by keeping the fee in exchange for incompetent work, his failure to pursue adequately and timely a claim also caused the loss of that client's ability to make a claim at all. *Id.* The present case is distinguishable from *Fallin* and *Ugwuonye*. The hearing judge found that Edib "accomplished most of what [Ms. Kismir] expected of him . . . ." Beyond this, there is simply no evidence that Ms. Kismir was injured because of Respondent's violations.

The fourth factor we consider is if there are any mitigating or aggravating circumstances. As we stated in *Ruddy*, "[s]uch mitigating factors include the absence of a prior disciplinary record, character or reputation, and conduct vis-a-vis the disciplinary proceeding." *Ruddy*, 411 Md. at 76, 981 A.2d at 664. Respondent is forty-seven years old. He has practiced law since 2000 without any complaints before the present one. He practices primarily as an immigration lawyer. Respondent also presented two character witnesses who praised his integrity and competence. Nothing suggests that Respondent was uncooperative with Bar Counsel.

---

**21.** Judge Craven found that "Ms. Kismir believed that she had the realtor's oral agreement to forgo his commission[,]" but that "[a]t settlement, without any objection from Respondent, the title company honored the listing agreement and paid the commission. . . ." Respondent then "unsuccessfully urged the broker to return [the fee]. Respondent, therefore, cannot be held liable for the forfeiture of the broker fee when he was not even a party to the alleged deal between Ms. Kismir and Tumbal regarding a different treatment of the broker's commission.

The facts of this case warrant a similar outcome to that reached in *Attorney Griev. Comm'n v. Snyder*, 406 Md. 21, 956 A.2d 147 (2008), and *Attorney Griev. Comm'n v. Brown*, 308 Md. 219, 517 A.2d 1111 (1986). In *Brown*, we found that an attorney administered incompetently a single estate based on various unintentional "shortcomings" in his representation, thus violating the predecessor to MRPC 1.1. 308 Md. at 232, 517 A.2d at 1117. We issued a reprimand because of his unblemished prior record and lack of inappropriate motives. *Id.* at 236, 517 A.2d at 1119. Likewise, in *Snyder*, the attorney provided incompetent legal services to his client. 406 Md. at 29, 956 A.2d at 151–2. The attorney also delayed the return of the unearned portion of his client's fee. *Id.* He did not contest the allegations that he violated MRPC 1.1 and 1.16. *Id.* We relied on *Brown*, in *Snyder*, when we held that a reprimand was warranted, considering the attorney's lack of a prior disciplinary record in thirty-seven years of practice and the fact that he violated the Rules only because of his "short-comings," rather than anything having to do with dishonest intent. *See id.* An attorney who represents incompetently his or her client, such as in *Brown*, is more of a danger to the public than one who fails to surrender documents after being terminated, such as Respondent did in this case. Furthermore, an attorney attempting to withhold client fees for services that were never performed, such as in *Snyder*, also raises more concern for protecting the public than the misconduct in Respondent's case.

▉ Although Respondent's failure may not be labeled an unintentional "shortcoming," we find the lack of a prior disciplinary record and deceitful intent to be influential. This Court has imposed harsher sanctions for MRPC 1.4 and 1.16 violations when other, more serious, circumstances are present. *See Ugwuonye*, 405 Md. at 375, 952 A.2d at 240 (imposing a 90–day suspension for violations of MRPC 1.4 and 1.16, in addition to many other violations across two different clients' cases). On the other hand, an isolated violation of a similar nature may warrant a reprimand. *See Attorney Griev. Comm'n v. Akpan*, 405 Md. 277, 289, 950 A.2d 820, 827 (2008)

(finding a reprimand to be the appropriate sanction when only MRPC 1.4 and 8.4 were violated). Applying the *Ruddy* factors, we conclude that, although Respondent may have withheld intentionally documents, the nature of the ethical duty, the actual or potential harm to the client, and the mitigating factors weigh in Respondent's favor. " 'The primary purpose in imposing discipline on an attorney for violation of the Rules of Professional Conduct is not to punish the lawyer but rather to protect the public and the public's confidence in the legal profession.' " *Ugwuonye* 405 Md. at 373, 952 A.2d at 239 (quoting *Attorney Griev. Comm'n v. Stein,* 373 Md. 531, 537, 819 A.2d 372, 375 (2003)). In light of this, we conclude that a reprimand is sufficient to protect the public.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THIS COURT, INCLUDING THE COST OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST TIMUR Z. EDIB.**

BATTAGLIA and ADKINS, JJ., concur.

ADKINS, J., concurring, in which BATTAGLIA, J., joins.

I concur with the judgment of the majority. I write separately, however, because I see some troubling implications arising from the majority opinion, which may or may not have been intended.

### I.

The majority indicates in its discussion of the facts that the fee contract "had a provision that established Respondent's compensation 'based on the greater of either Three Hundred Dollars ($300) per hour for services rendered or a flat legal commission of fifteen percent (15%) of the gross value for all assets (personal or real property) received and handled through my office or escrow account for your benefit.' " Maj. Op. at 702, 4 A.3d at 961. Thus, under the contract Respon-

dent would be paid $300 per hour for work performed, even if 15% of the value of the "assets . . . received and handled" was less than that sum.

Yet, in its opinion the majority refers to it as a "contingent fee[,]" Maj. Op. at 709, 4 A.3d at 965, and seems to premise a portion of its analysis on the concept that the risk inherent in a contingency fee justifies a larger fee paid to the attorney. For example, the majority emphasizes that the "amount of time and effort that would be required to resolve the matters concerning Decedent's assets (probate and non-probate), to advise and assist Ms. Kismir in managing and disposing of those assets, and in performing the other tasks she required, was entirely unknown at the inception of this relationship." I do not completely agree with this analysis. Certainly, the nature and extent of the work was unknown, but Respondent knew that, whatever the work, he would be paid his hourly rate. Thus, Respondent had the benefit of both the hourly rate guarantee and the upside potential to receive a fee greater than his hourly rate. Although a fee agreement calling for the greater of a percentage or an hourly rate is perfectly acceptable, when a court is asked to evaluate that fee for reasonableness within the context of Maryland Lawyers' Rules of Professional Conduct ("MRPC") 1.5, this hybrid fee arrangement does not justify a rate higher than that which would otherwise be reasonable. This is unlike a straight percentage fee, in which the lawyer runs the risk of performing work for which the lawyer is not paid.

## II.

The majority is dismissive of the AGC's contention that the fee charged by Respondent was unreasonable because it vastly exceeded that which could be recovered were Respondent to be handling a probate estate in Maryland,[1] and that which was

---

1. To determine the appropriate attorney's fee, one must review two separate provisions of the Estates and Trusts Article of the Maryland Code. First, Md.Code (1974, 2001 Repl.Vol.) Section 7–602 of the Estates & Trusts Article ("E.T.") provides:

recommended as a reasonable fee in Virginia for estate matters.[2] As I compute it, his fee was at least three times what is

---

(a) General.—An attorney is entitled to reasonable compensation for legal services rendered by him to the estate and/or the personal representative.

(b) Petition.—Upon the filing of a petition in reasonable detail by the personal representative or the attorney, the court may allow a counsel fee to an attorney employed by the personal representative for legal services. The compensation shall be fair and reasonable in the light of all the circumstances to be considered in fixing the fee of an attorney.

(c) Considered with commissions.—**If the court shall allow a counsel fee to one or more attorneys, it shall take into consideration in making its determination, what would be a fair and reasonable total charge for the cost of administering the estate under this article, and it shall not allow aggregate compensation in excess of that figure.**

(Emphasis added). E.T. § 7–601 provides:

(a) Right to compensation.—A personal representative or special administrator is entitled to reasonable compensation for services . . .

(b) Computation of compensation.—Unless the will provides a larger measure of compensation, upon petition filed in reasonable detail by the personal representative or special administrator the court may allow the commissions it considers appropriate. **The commissions may not exceed those computed in accordance with the table in this subsection.**

| If the property subject to administration is: | The commission may not exceed: |
|---|---|
| Not over $20,000 | 9% |
| Over $20,000 | $1,800 plus 3.6% of the excess over $20,000. |

(Emphasis added).

**2.** Virginia provides that executors of an estate may receive "reasonable compensation" subject to the approval of the Virginia Commissioner of Accounts. *See* Va.Code Ann. § 26–30 (2010). The Virginia Commissioner of Accounts has set forth guidelines for a reasonable fee as follows:

[T]he Commissioner, in the absence of unusual circumstances, will allow a fee based upon the following:

(1) Income—5% of income receipts (not including capital gains) realized during each accounting period.

2. Principal—A fee based upon the inventory value, including amended inventories, of the decedent's probate assets in accordance with the following schedule:

| First $400,000.00 | 5% |
|---|---|
| Next $300,000.00 | 4% |
| Next $300,000.00 | 3% |

called for under both of these fee schedules.[3]   To be sure, since the fees in question were for properties outside of probate, these fee schedules (one statutory, one not) are not directly applicable.   Yet, the work is quite similar to that which an attorney might do in Maryland when hired by a personal representative to handle an estate.   Unlike the majority, I submit that it is often the case that an attorney handling an estate will spend time visiting banks to determine what might be in a safe deposit box there, and/or whether the decedent may have accounts there.   Investigating brokerage accounts and negotiating with tenants or handling other property matters is also quite typical, and in Maryland would not normally justify a fee higher than the formula set forth in Md.Code (1974, 2001 Repl.Vol.), Section 7–601 of the Estates & Trusts Article ("E.T.").   I would not be so dismissive of these indicia of reasonableness.   Indeed, although the AGC had the burden to show by clear and convincing evidence that the Respondent violated MRPC 1.5(a), in my view, a percentage fee three times the amounts approved in Maryland and Virginia for similar work in probate estates (without the requirements of preparing an accounting) should be given heavy weight in determining unreasonableness.   I disagree with the majority opinion in its implication (by its dismissive treatment of the AGC's argument), that these fee schedules are not significant yardsticks in a situation like this one.

I shall not go into the nitty-gritty question of whether Respondent's efforts were such as to justify a fee greater than these scheduled fees.   This would require close examination of the record, and perhaps a determination of whether Respon-

---

Office of the Commissioner of Accounts, *Fiduciary Compensation Schedule—Executors and Administrators* 1 (2007), *available at:* http://www.fairfaxcommissionerofaccounts.org/open/docs/resource.fidcomp.estate fidcomp.pdf (last visited September 14, 2010).

3.   The Respondent received a fee of $143,970, or 15% of $959,800, the total sale value of the three properties.   Under the Maryland statute, the Respondent's maximum fee would have been slightly over $35,000 for similar services in probate, and under the Virginia guidelines, a reasonable probate fee would have been just under $40,000.

dent had the burden to show how much work he did to justify exceeding these schedules, or whether the AGC had the burden to seek discovery of his time records and introduce them into evidence. I leave that question for future determination [4] because in this case, even were the fee unreasonable, I would nonetheless agree with the majority that a reprimand is the correct sanction for Mr. Edib.

Judge BATTAGLIA authorizes me to state that she joins in the views expressed in this opinion.

———

4. With the increasingly popular use of inter vivos revocable trusts people avoid probate, but not necessarily attorneys' fees. Their assets will pass directly to the designated beneficiaries, without the formalities of an estate, but attorneys will still have much to do. This work will include, e.g., identifying property by searching safety deposit boxes; contacting banks, insurance companies and other institutions; conveying title from the trustee to the beneficiaries; recovering on insurance policies; determining amount of taxes, etc. Cases may arise in which we are asked to decide what fee is reasonable in this context, and the fee schedule for probate estates would be useful as a comparison.